2015 VT 49
 

 


 








In re Application of Lathrop
Limited Partnership I, II, III (2013-444, 2013-445, 2013-446)


 


2015 VT 49


 


[Filed 20-Mar-2015]


 


NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.


 


 




 
 

 
 
 2015 VT 49

 

 

 



 




 
 

 
 
 Nos. 2013-444, 2013-445 & 2013-446

 

 

 



 




 
 

 
 
 In re Application of Lathrop
 Limited Partnership I

 

 
 
 Supreme Court

 

 

 

 
 
 In re Application of Lathrop Limited Partnership II

 
 In re Application of Lathrop Limited Partnership III

 

 
 
  

 
 On Appeal from

 
 Superior Court,

 

 

 

 
 
  

 

 
 
 Environmental Division

 

 

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
 October
 Term, 2014

 

 

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 

 

 
 
 Thomas
 S. Durkin, J.

 

 

 

 
 
  

 

 

 



William A. Nelson, Middlebury, and James A. Dumont of Law
Office of James A. Dumont, PC,


  Bristol, for Appellants.


 


Mark G. Hall of Paul Frank + Collins P.C., Burlington, for
Appellee.


 


William H. Sorrell, Attorney General, and Robert F.
McDougall, Assistant Attorney General,


  Montpelier, for Amicus Curiae Vermont Natural
Resources Board.


 


 


PRESENT:    Reiber, C.J., Dooley, Skoglund and
Robinson, JJ., and Morse, J. (Ret.), 


                    
Specially Assigned


 


 


¶ 1.            
DOOLEY, J.   This appeal arises from a decision of the
Superior Court, Environmental Division in three consolidated dockets, all of
which carved a very long and circuitous path through the lower tribunals before
reaching this Court.  The subject of these dockets is the proposal of
Lathrop Limited Partnership (“Lathrop”) to establish a sand and gravel
extraction operation on a parcel of land in the Town of Bristol, Vermont. 
Neighbors of the project appeal the environmental court’s decision to approve
Lathrop’s conditional use and Act 250 permit applications, and raise six claims
of error.  They argue that the court erred in: (1) holding that sand
and gravel extraction is permitted as a conditional use in the Town’s Rural
Agricultural (RA-2) and Mixed Use (MIX) zoning districts; (2) holding that the
operation will not create a pit within the meaning of § 526(2) of the
Town’s zoning bylaws; (3) concluding that the court could review Lathrop’s 2012
permit application de novo, without regard to the 2004 permit, and that the successive-application
doctrine does not apply; (4) relying on one-hour average noise levels and
ignoring uncontested evidence of large increases in the number of high-decibel
noise events in determining impact of traffic on neighbors; (5) admitting and relying
on acoustical-modeling software for predicting noise levels emitted by the
project; and (6) concluding that it had jurisdiction to review Lathrop’s
amended Act 250 permit application without a remand.  We affirm the
environmental court’s holdings that sand and gravel extraction is permitted as
a conditional use in the RA-2 and MIX districts and that the
acoustical-modeling testimony is admissible.  We reverse its holdings with
respect to the creation of a pit under § 526(2), the successive-application
doctrine, the impact of traffic noise on neighbors, and its jurisdiction to
review Lathrop’s amended Act 250 permit application.


¶ 2.            
We start with the factual and procedural background.  The three
environmental court dockets, Lathrop I, No. 122-7-04, Lathrop II,
No. 210-9-08, and Lathrop III, No. 136-8-10, are addressed in turn
below.  Much of the detailed description of the proposals and
administrative and environmental court actions is set forth in the attached
Appendix.


Lathrop
I


¶ 3.            
In 2003,[1]
Lathrop applied for a permit from the Town of Bristol’s Zoning Board of
Adjustment (ZBA) for a proposed sand and gravel extraction operation on a
sixty-five acre parcel located on South Street, Rounds Road, and Bristol Notch
Road in the Town’s RA-2 and MIX zoning districts.  Lathrop proposed to
extract up to 60,000 cubic yards of material per year, resulting in an average
of seventeen truckloads each day over 250 days of operation.  As proposed,
the extraction would take place exclusively within the RA-2 district, with an
access road to the pit from South Street at the northern edge of the
parcel.  The access road would pass through the MIX district, where it
would cross over a preexisting, but abandoned, non-conforming gravel pit.
 At its July 2004 hearing, the ZBA voted to consider the application under
§ 526 of the Town of Bristol Zoning Bylaws & Regulations (2003)
[hereinafter Bylaws], which provides, in pertinent part, that “in any district
the removal of sand and gravel for sale . . . shall be
permitted only after conditional use review and approval by the Board of
Adjustment.”  In reviewing the application, the ZBA found no fewer than
nine other gravel pits in the Town, at least three of which were also located
in the RA-2 district.  The ZBA also considered the character of the area;
the noise levels associated with the project; possible increases in truck
traffic along public highways; impact on historic and natural sites; impact on
the Town’s water supply; and Lathrop’s proposals for a reclamation plan,
erosion control, and other related issues.


¶ 4.            
The ZBA also addressed the nine criteria listed in § 526, to which
all projects must conform.  Specifically, the ZBA determined that,
pursuant to provision (8), the project would not constitute an extension of an
existing non-conforming operation; and, pursuant to provision (2), the project
would not create a pit within the meaning of § 526 because a pit must have
“vertical sides” or “an almost perpendicular slope or pitch.”  The ZBA
ultimately approved the application with twenty-three additional conditions,
which included, among other things, limits on days and hours of operation,
scope of extraction, decibel levels, and daily truck trips; mitigation with
respect to noise, dust, traffic, and aesthetics; and requirements for access
road construction, reclamation, and reporting and recordkeeping.  The
conditions, which are set forth in greater detail in the Appendix, have become
a central focus of this appeal.


¶ 5.            
Neighbors appealed the ZBA’s decision to the environmental court. 
The parties filed cross-motions for summary judgment, which the court addressed
in In re Rueger, No. 122-7-04 Vtec, slip op. (Vt. Envtl. Ct. May 5,
2005), https://www.vermontjudiciary.org/GTC/

Environmental/Opinions.aspx, and again in a supplemental decision and order
dated June 23, 2005.  The court held that the ZBA properly reviewed
Lathrop’s application under § 526 of the bylaws and that the access road
across the discontinued gravel pit would not constitute an extension of a
non-conforming operation.  The court found, however, that material facts
remained in dispute as to whether, and under what conditions, the proposed sand
and gravel operation should be granted a conditional use permit.  The
parties initially prepared for trial on the remaining issues, but then
requested that the court place the appeal on inactive status while Lathrop
sought additional permits for the project.  This appeal has been termed Lathrop
I.


Lathrop
II


¶ 6.            
In 2007, Lathrop submitted a second application to the ZBA for the sand
and gravel extraction operation, partly in response to concerns and criticisms
about the original proposal.  At its September 2008 hearing, the ZBA
determined that the new application differed substantially from the original
application approved in 2004, citing the changed access point to Rounds Road at
the southern end of the parcel, altered phasing scheme for the development, and
addition of plantings for screening purposes.  The ZBA noted that “no
provision of the [bylaws] prohibits filing an application for a zoning permit
that differs substantially from a permit previously granted and that remains
undeveloped.”  Additionally, Lathrop’s second application presented
extended hours of operation, an increase in the scope of extraction and average
daily truck trips, higher decibel levels at property boundaries, and a narrower
road bed for the access road.  Although the ZBA found that the second
application satisfied nearly all the conditional use requirements, it
ultimately denied the permit for Lathrop’s failure to submit a plan for
refilling the resulting pit, as required under § 526(2).


¶ 7.            
Lathrop appealed the ZBA’s denial of its 2007 application to the
environmental court.  Several neighbors filed a motion to dismiss on
various grounds, including that the application was not ripe for review and
that it asked for an advisory opinion.  They primarily argued that the new
proposal was a successive application that did not meet the requirements of the
successive-application doctrine.  The court denied neighbors’ motion,
holding in pertinent part that the successive-application doctrine does not govern
because the second application was not a revised proposal submitted as a
consequence of the ZBA denying the original application.  Neighbors then
moved for summary judgment on the issue of whether the project will create a
pit within the meaning of the bylaws.  The Town submitted a memorandum in
support of neighbors’ motion for summary judgment, concurring with their
argument that Lathrop’s operation will create a pit and also asserting that
Lathrop failed to present its plan for a berm removal to the ZBA and therefore
should be barred from doing so on appeal.  In In re Lathrop Limited
Partnership II, No. 210-9-08 Vtec, slip op. (Vt. Envtl. Ct. Aug. 14, 2009),
https://www.vermontjudiciary.org/GTC/Environmental/Opinions.aspx, the court
denied neighbors’ motion for summary judgment, reasoning that the question of
whether the reclaimed extraction area is a pit under § 526(2) is highly
fact-specific.  Id. at 3.  The court also concluded that its
de novo review allows it to consider project revisions so long as the revisions
do not require a new application.  The parties then requested to stay this
and the Lathrop I appeals pending completion of the Act 250 proceedings.


Lathrop
III


¶ 8.            
In 2006, Lathrop filed its first Act 250 permit application with the
District No. 9 Environmental Commission, while the environmental court was
considering Lathrop I.  In the 2006 application, Lathrop requested
that the district commission consider only whether the project conforms with
the Bristol Town Plan—more specifically, whether the town plan prohibits sand
and gravel extraction in the MIX and RA-2 districts.  The district
commission concluded that the project conflicted with the town plan,
specifically because the plan prohibits the creation of pits, and denied the
application.  Lathrop appealed to the environmental court.  After a
series of motions from the parties, the court granted Lathrop’s motion to
remand the application to the district commission for consideration under all
relevant Act 250 criteria.[2]


¶ 9.            
In July 2010, on remand, the district commission found that Lathrop’s
application conformed with criteria 1 (air pollution), 1(B) (waste disposal),
1(G) (impact on wetlands), 2 (sufficiency of water supply for dust
suppression), 3 (potential impact on neighboring wells), 8(A) (impact on
wildlife), 9(A) (impact of growth), 9(B) (impact upon primary agricultural
soils), 9(C) (impacts on forests and secondary agricultural soils), and 9(L)
(rural growth areas).  The district commission also found that Lathrop
failed to submit evidence sufficient to carry its burden with respect to
criteria 8 (aesthetics, noise, visual impacts, odors), 5 and 9(K)
(transportation and pedestrian safety, public investment), 9(E) (impacts from
pit operations, sufficiency of reclamation plan, blasting impacts), and 10
(town and regional plan).  Lathrop appealed to the environmental court the
district commission’s determination on criteria 5, 8, 9(E), 9(K), and 10 and
moved to consolidate the three dockets.  The court granted Lathrop’s
motion to consolidate and moved Lathrop I and Lathrop II out of
inactive status.


Consolidated
Appeal


¶ 10.        
The three consolidated dockets proceeded to trial in the environmental
court.  Prior to trial, neighbors filed several motions.  The court
addressed three of these motions, all relevant to this appeal, in a 2011
order.  First, the court denied neighbors’ motion to exclude evidence of
the berm removal, concluding that the proposal was merely a minor application
revision allowable under the court’s de novo review.  Second, the court
denied neighbors’ motion for partial summary judgment on the issue of Lathrop’s
conflicting permit applications.  Neighbors argued that Lathrop should be
prohibited from presenting a second application after its first application
already was approved conditionally by the ZBA.  The court concluded that
nothing prevents applicants from submitting conflicting proposals for the same
project and stated that “[t]he only restriction to submitting another
application arises after a permit application has been denied: in that
instance, an applicant is prohibited from submitting an application that is
substantially similar to the one that was denied.”  Finally, the court denied
neighbors’ motion to reconsider its 2009 decision under Lathrop II,
where it denied summary judgment on the issue of whether § 526 allows sand
and gravel extraction in the RA-2 and MIX districts, because neighbors’ motion
was filed beyond the ten-day limit specified in Vermont Rule of Environmental
Court Proceedings 5(b) and neighbors did not submit any new information or
argument that would justify reconsideration.


¶ 11.        
Neighbors also moved for the court to rule as inadmissible testimony
based on acoustical modeling from Lathrop’s expert witness on noise impacts,
arguing that it violated Vermont Rule of Evidence 702 and the standard for
admissibility of expert testimony, as outlined in Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993).  The court decided to
allow the testimony at trial and make a post-trial determination as to whether
it should remain part of the record.  The court ultimately denied
neighbors’ motion and admitted the testimony.  We address this issue in
the merits below.


¶ 12.        
The environmental court considered several issues preserved by the
parties on each of the three dockets.  As relevant to this appeal, it held
that § 526 of the bylaws permits sand and gravel extraction operations in
the RA-2 and MIX districts; Lathrop’s project will not create a pit within the
meaning of § 526(2); and Lathrop’s application adequately addresses
impacts from noise, as required under both the Town’s bylaws and the Act 250
criteria.  Neighbors appealed.  With regard to the noise impacts,
neighbors specifically appeal the court’s reliance on one-hour average noise
levels to determine impacts and the court’s decision to admit evidence based on
acoustical modeling.  In addition to these three issues, neighbors also
appeal the court’s decision to review Lathrop’s conflicting conditional use
applications and the change in access point from Rounds Road to South Street,
which Lathrop presented for the first time at trial.


I.


¶ 13.        
The first issue, and a threshold matter, is whether the bylaws allow
sand and gravel extraction in the RA-2 and MIX districts.  Before
proceeding to the parties’ arguments, we set forth the relevant bylaws. 
The primary bylaw at issue is § 526, which regulates the extraction of
soil, sand, and gravel.  Section 526 states, in pertinent part:


  In accordance with [24 V.S.A.
§ 4407(8)], in any district the removal of sand or gravel for sale, except
when incidental to construction of a structure on the same premises, shall be
permitted only after conditional use review and approval by the Board of
Adjustment.


Bylaws § 526.[3]  The bylaw goes on to require
conformity with nine specific conditions and to allow for the attachment of
additional conditions as the ZBA deems necessary to protect the safety and
general welfare of the public.  Additional criteria for conditional use
review are laid out in § 341, including requirements that the proposed
uses shall not result in an undue adverse effect on community facilities, the
character of the area, traffic, and other bylaws and ordinances in effect.


¶ 14.        
Sand and gravel extraction is considered “quarrying” in § 130, the
definition section of the bylaws.  Quarrying, in turn, is listed as a form
of “heavy manufacturing or industry,” which is defined as “[t]he processing,
assembly, distribution, or packaging of natural or man-made products where such
activity results in substantial off-site impacts or all such activity and
storage of raw or finished products is not enclosed inside a building or
screened from the abutting properties and public rights-of-way.”  Id.
§ 130.  Conversely, “light manufacturing or industry” encompasses
activities that do not result in substantial off-site impacts and are enclosed
inside a building or otherwise screened from adjacent properties and
rights-of-way.  Id.


¶ 15.        
Sections 1000 through 1013 provide specific regulations for each
individual district, including a statement of objectives and guidelines and an
itemized list of permitted uses.  No district expressly permits sand and
gravel extraction or any form of quarrying as either an authorized or
conditional use.  Although several districts permit as a conditional use
“light manufacturing,” only one district, the Commercial District (C-1),
§ 1005, broadly permits “industrial use,” which can be interpreted to
encompass both heavy and light manufacturing.  Similarly, no district
expressly prohibits sand and gravel extraction or quarrying in its statement of
objectives and guidelines.


¶ 16.        
With respect to the RA-2, § 1002, and MIX, § 1012, districts,
neither lists as by-right or conditional uses sand and gravel extraction,
quarrying, heavy manufacturing, or industry.  The RA-2 district does not
permit light manufacturing and, as noted in the statement of objectives, “is
intended to be primarily residential in character.”  Id.
§ 1002.  The MIX district does permit light manufacturing as a
conditional use, but expressly prohibits heavy manufacturing in its statement
of objectives.  Id. § 1012.


¶ 17.        
In addition to the district-by-district enumeration of permitted uses,
§ 546 provides a blanket restriction on several specific uses within
certain zoning districts, including the MIX district.  Within this list of
prohibited uses is “unenclosed manufacturing or processing of goods or
materials,” which aligns with the definition of “heavy manufacturing.”  Id.
§ 546.  The bylaw does not specifically list “quarrying” or “sand and
gravel extraction.”


¶ 18.        
With this regulatory background in mind, we turn to the parties’
arguments and interpretations of the bylaws.  Neighbors argue that the
ZBA’s and environmental court’s interpretation allowing sand and gravel
extraction in any zoning district creates internal inconsistencies within the
bylaws—that is, § 526 would expressly allow sand and gravel extraction
while other bylaws prohibit this use.  They reason that because sand and
gravel extraction is defined as a form of quarrying, which in turn is defined
as heavy manufacturing—and heavy manufacturing is prohibited in virtually all
districts—sand and gravel extraction must be prohibited in these same
districts.  Specifically, they argue that because neither the RA-2 nor the
MIX district expressly allows heavy manufacturing, sand and gravel extraction
must be prohibited in these districts.  Under neighbors’ theory, we should
read § 526 to mean that “in any district zoned to allow it the
removal of sand or gravel for sale . . . shall be permitted
only after conditional use review and approval by the Board of
Adjustment.”  This, according to neighbors, is the only reading that will
not produce absurd results.


¶ 19.        
Lathrop, on the other hand, urges us to look at the plain language of
§ 526, which, it contends, expressly allows sand and gravel extraction in
all districts, subject only to conditional use approval.  Lathrop’s theory
is that because no other provision expressly prohibits sand and gravel
extraction, but merely heavy industry or unenclosed manufacturing, the more
specific language of § 526 should trump the more general language found in
the other bylaws.  Lathrop also argues that any ambiguity should be
resolved in favor of the landowner and that because the ZBA twice stated that § 526
allows sand and gravel extraction we should sustain its interpretation. 
Both the ZBA and the environmental court agreed with Lathrop and concluded that
§ 526 of the bylaws allows sand and gravel operations in any district,
including the RA-2 and MIX districts, subject only to conditional use review.


¶ 20.        
The fundamental difference between the two interpretations advanced by
the parties is that neighbors’ reading creates a necessary condition,
while Lathrop’s reading, and the reading adopted by the ZBA and environmental
court, creates a sufficient condition.  The ambiguous phrase at
issue in § 526 is “in any district.”  Neighbors’ theory asks that we
read “in any district” to mean in any district where sand and gravel
extraction is permitted.  Thus, meeting the requirements of § 526
is a necessary, but not sufficient, condition of approval; the use still must
be expressly permitted in the relevant district.  Lathrop’s theory asks
that we read “in any district” without restriction.  Thus, meeting the
requirements of § 526 is sufficient to meet the requirements of
conditional use approval because sand and gravel extraction is conditionally
permitted in any district.


¶ 21.        
Our decision is greatly affected by the standard of review. 
Although we review the environmental court’s legal conclusions de novo, In
re Grp. Five Inv. CU Permit, 2014 VT 14, ¶ 4, ___ Vt. ___, 93 A.3d
111, we will uphold those conclusions if “they are reasonably supported by the
findings.”  In re Champlain Oil Co. Conditional Use Application,
2014 VT 19, ¶ 2, ___ Vt. ___, 93 A.3d 139.  We will defer to the
court’s factual findings and uphold them “unless taking them in the light most
favorable to the prevailing party, they are clearly erroneous.”  Id. 
We also defer to the environmental court’s construction of a zoning ordinance
“unless it is clearly erroneous, arbitrary, or capricious,” In re Beliveau
NOV, 2013 VT 41, ¶ 8, 194 Vt. 1, 72 A.3d 918, and to a municipality’s
interpretation of its own ordinance if it is reasonable and has been applied
consistently.  In re Champlain Coll. Maple St. Dormitory, 2009 VT
55, ¶ 10, 186 Vt. 313, 980 A.2d 273.


¶ 22.        
This case involves competing claims of statutory interpretation, each relying
on a different canon of construction.  We interpret zoning ordinances
according to the principles of statutory construction, In re Laberge
Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578, 15 A.3d 590 (mem.), and
adopt an interpretation that implements the legislative purpose.  In re
Grp. Five Inv., 2014 VT 14, ¶ 23.  As usual, we start with the
plain language and will enforce it according to its terms if it is
unambiguous.  Evans v. Cote, 2014 VT 104, ¶ 13, ___ Vt. ___,
___ A.3d ___.  We conclude that the plain language of § 526 is
ambiguous and therefore cannot interpret the bylaw on the plain language alone.[4]  


¶ 23.        
Neighbors base their interpretation of § 526 on the text of 24
V.S.A. § 4407(2) (repealed 2005),[5]
from which part of the language of § 526 was derived.  They cite Drumheller
v. Shelburne Zoning Board of Adjustment, 155 Vt. 524, 586 A.2d 1150 (1990),
for the proposition that when the language of a regulation closely tracks the
language of an enabling statute, the regulation must be construed in the same
way as the statute.  Id. at 529, 586 A.2d at 1152. 
Consequently, neighbors reason, because the enabling statute here confers on
the municipality only the authority to allow conditional uses in any zoning
district, and does not state that such uses may be undertaken in all districts
so long as the applicant satisfies the relevant criteria, then § 526
cannot be read any more broadly to allow sand and gravel extraction in any
district.[6]


¶ 24.        
We are not persuaded by neighbors’ argument.  They overextend our
statement in Drumheller to mean that any time regulatory language is
derived from statutory language it must be read in precisely the same
manner.  The question in Drumheller was one of defining an
ambiguous term: “developed.”  Because the language in the ordinance was
identical to that of the enabling statute, using the term “developed” in the
same manner, we inferred that the drafters of the bylaw intended the term to
have the same meaning as in the statute.  Id.  We then looked
to the related definition section in the statute to discern the term’s
meaning.  Id.  Here, however, we are not comparing identical
language.  While the language of § 526 indeed has been derived from
the statute, the nature of the language as transposed from the statute to the
bylaw has been altered from the general—municipalities may permit conditional
uses—to the specific—sand and gravel extraction requires a conditional use
permit.  We cannot conclude here as we did in Drumheller that the
bylaw regulating sand and gravel extraction must be read in precisely the same
manner as the enabling statute.[7]



¶ 25.        
The fact that myriad other towns have adopted the same pro forma
language with respect to sand and gravel extraction, all tailored somewhat
differently, lends further support for our conclusion.[8]  If we were to interpret every such
bylaw in the same manner as the statute, we would negate the more
individualized language incorporated by the towns into these bylaws.[9]


¶ 26.        
Nor are we persuaded by neighbors’ other related arguments.  They
argue that it makes no sense for the Town to single out sand and gravel
extraction for special treatment.  While it is not for us to judge the
wisdom of the drafters in choosing to incorporate this bylaw, we do note that
the Town contains several sand and gravel extraction operations, as found by
the ZBA when reviewing Lathrop’s first application.  The proliferation of
these operations may suggest that the region is well-suited for this type of
operation, or that the Town itself finds a strong demand for sand and
gravel.  Whatever the rationale, it is reasonable for the Town to create
an exception for this type of activity.  And the fact that so many other
towns have followed suit with similar bylaw provisions suggests a larger trend toward
favoring sand and gravel operations throughout the state.  Moreover, as we
observed above, supra, ¶ 23 n.6, the Legislature treated soil,
sand, and gravel removal separately from other extraction activities when it
passed 24 V.S.A. § 4407(8).


¶ 27.        
In another related argument, neighbors predict that the ZBA’s and
environmental court’s construction of § 526 will result in sand and gravel
extraction in districts reserved for residential use, the historic downtown, or
other areas not suitable for intensive industrial operations, thereby
interfering with the use and enjoyment of those neighboring properties impacted
by the operations.  They cite to the seminal zoning case Village of
Euclid v. Ambler Realty Co., 272 U.S. 365 (1926), to support their
contention that construing zoning regulations narrowly in favor of the
landowner cuts both ways.  Neighbors liken sand and gravel operations in
the Town’s many non-industrial districts to the notorious “pig in a parlor”
from Euclid—the right thing in the wrong place that creates a nuisance
for the surrounding properties.  Id. at 388.


¶ 28.        
We emphasize that just because the bylaws permit sand and gravel
extraction in any district does not mean that such an operation will end up in
the middle of a high-density residential or commercial district, a sensitive
conservation district, or on any other parcel of land where it is incompatible
with surrounding uses.  Such is the nature of conditional use review to
ensure that the uses are appropriately sited and conditioned to harmonize with
their surroundings.  Not only does § 4414(3)(A) provide baseline
standards for review, including that the proposed use “shall not result in an
undue adverse effect on . . . [t]he character of the area affected,”
24 V.S.A. § 4414(3)(A)(ii), but § 341 of the bylaws ensures, among
other things, a “harmonious relationship between proposed uses and existing
adjacent uses.”  Moreover, the high-density commercial and residential
districts invariably offer restrictive lot sizes with strict setback
requirements.  See Bylaws §§ 1009-1013.


¶ 29.        
We do find that a number of statutory construction principles aid
Lathrop.  First, because zoning ordinances “are in derogation of common
law property rights,” they must be construed narrowly in favor of the property
owner, In re Champlain Oil Co., 2014 VT 19, ¶ 2, and “any ambiguity
is resolved in favor of the landowner.”  In re Tyler Self-Storage Unit
Permits, 2011 VT 66, ¶ 16, 190 Vt. 132, 27 A.3d 1071 (quotation
omitted).  Neighbors misunderstand the rationale behind this rule. 
They reason that it equally should favor the rights of neighboring property
owners, but their reliance on Euclid here undercuts their
argument.  Euclid concerned a municipality’s power to regulate land
use within the constraints of the United States Constitution’s substantive due
process protections.  The United States Supreme Court upheld zoning
regulations, recognizing that a municipality may have a rational reason for
separating incompatible uses, and set the precedent that zoning regulations are
presumptively valid.  Euclid, 272 U.S. at 395.  Ambiguous
zoning regulations, however, risk arbitrary and capricious exercise of the
police power in violation of due process.  1 A. Rathkopf et al., The
Law of Zoning and Planning § 2:3 (4th ed. 2014).  The strict
construction rule serves to protect the landowner whose common law property
rights are being restricted by the regulation.  We do, however, recognize
that neighboring property owners have a right to the use and enjoyment of their
property; the common law nuisance doctrine protects this right.  As such,
any ambiguity in § 526 is construed in favor of Lathrop.


¶ 30.        
Second, if we adopt neighbors’ interpretation, we will be reading a
restrictive condition into the bylaw—the condition that “in any district” means
“in any district where sand and gravel extraction is permitted.”  We
generally do not read conditions into the language of the bylaw unless
necessary to make it effective.  See Brennan v. Town of Colchester,
169 Vt. 175, 177, 730 A.2d 601, 603 (1999).  As we can interpret the bylaw
effectively without imposing such a condition, we must not do so here.


¶ 31.        
Finally, a commonly recognized method for reconciling conflicting
statutory provisions is to hold the specific provision as an exception to the
general.  Smith v. Desautels, 2008 VT 17, ¶ 17, 183 Vt. 255,
953 A.2d 620; see also Stevenson v. Capital Fire Mut. Aid Syst., Inc.,
163 Vt. 623, 624-25, 661 A.2d 86, 88 (1995) (mem.) (holding that statute
providing immunity for fire departments and their personnel trumps statute
providing for waiver of sovereign immunity upon purchase of insurance and
concluding that fire departments therefore are immune from liability regardless
of insurance).  This also is applicable in the context of municipal
ordinances.  See 6 E. McQuillin, The Law of Municipal Corporations
§ 20:63 (3d ed. rev. 2008) (“When general and specific provisions are
employed in ordinances, where there are two provisions, one general and the
other specific and relating to only one subject, the specific provision
ordinarily must prevail and be treated as an exception to the general
provision.”).  Here, by the use of general terms—heavy manufacturing,
industry, unenclosed manufacturing—sand and gravel extraction would appear to
be prohibited in all but the C-1 District.  But we must read the specific
provision, § 526, as an exception to this general rule, thereby treating
sand and gravel extraction as an exception to the prohibition on heavy
manufacturing.  While neighbors contend that the other bylaws are equally
specific, we cannot overlook the fact that nowhere in the bylaws is sand and
gravel extraction ever explicitly regulated or even mentioned—except in
§ 526.  This is the same reasoning supplied by both the ZBA and the
environmental court, and we find no reason not to defer to their
interpretation.


¶ 32.        
Lathrop’s interpretation also has some support in our prior case
law.  In In re John A. Russell Corp., 2003 VT 93, 176 Vt. 520, 838
A.2d 906 (mem.), we looked at similar inconsistencies with respect to
conditional uses in the Town of Clarendon’s bylaws.  There, the appellants
argued that asphalt plants are prohibited in the commercial-residential
district because they are not listed as a permitted use within that
district.  We concluded that the bylaw regulating uses within the
commercial-residential district “does not limit . . . the
[Town of Clarendon Zoning Board of Adjustment’s] authority to approve an
asphalt plant as a conditional use under the separate conditional use
provision.”  Id. ¶ 27.  We further stated, in response to
the appellants’ observation that another bylaw sets forth a specific list of
conditional uses allowed in other zoning districts, that “[w]e discern no basis
to conclude from this that the ordinance may not incorporate a different
approach for the commercial-residential district by allowing a [conditional use
permit] for those uses not otherwise permitted.”  Id.


¶ 33.        
We therefore conclude that our deferential standard of review and the
principles of statutory construction favor Lathrop’s interpretation that the
bylaws allow sand and gravel extraction as a conditional use in any district. 
The environmental court did not err in holding that the project location did
not violate the bylaws.


II.


¶ 34.        
As we have concluded that Lathrop’s proposed sand and gravel extraction
operation is permitted as a conditional use in the RA-2 and MIX districts, we
must determine if the project will create a “pit” within the meaning of
§ 526(2).  The court found that upon completion of the excavation the
reclaimed area will be left with a cavity measuring 1000-by-1100 feet across
and 100 feet deep at its deepest point.  The issue is whether this cavity
is a pit.


¶ 35.        
Section 526(2), the controlling bylaw, provides:


  The removal of material shall be
conducted so as to result in the improvement of the land, having due regard to
the contours in the vicinity such as leveling slopes and removing hills. 
The digging or creating of pits or steep slopes shall not be permitted, unless
provision is made to refill such pit.


The term “pit” in § 130, the
definition section of the bylaws, is cross-referenced with “quarry,” which is
defined as “[m]arble, granite, or other stone extraction operations and any
land development incidental thereto . . . includ[ing]
extraction of soil, sand or gravel and the enlargement of any existing quarrying
excavations.”  Although “steep slope” is not explicitly defined,
§ 526(7) requires that “slopes in excess of one to two shall be adequately
fenced.”[10]


¶ 36.        
The 2004 ZBA concluded that Lathrop’s project would not create a
pit.  The ZBA found that no definition of pit was provided in the bylaws
and referenced a dictionary definition describing pits as having “vertical
sides.”  In a reversal of its 2004 interpretation, the 2008 ZBA concluded
that § 526(2) prohibits any substantial depression or large hole in the
landscape that remains unfilled, no matter how steep the slopes.  The ZBA
observed that § 526 targets open-pit techniques, which result in
alterations to the landscape that do not “mesh[] with the surrounding contours
of the land.”  The ZBA emphasized that “[a]t the end of the day, the
intent of § 526(2) is for the discontinued pit site to blend in with the
surrounding landscape, rather than leave the landscape in a state that
testifies unremediated removal of material.”


¶ 37.        
The environmental court adopted the interpretation of the 2004 ZBA and
concluded that because Lathrop’s project would maintain slopes of no more than
1:2 (rising one foot for every two feet across) during the lifetime of the
project and result only in a “shallow saucer” with a 1:10[11] slope in the end, it would not have
steep slopes and therefore not create a pit.  The court supported its
interpretation with the language of § 526(7), which requires that steep
slopes be fenced.  The court reasoned that Lathrop’s “shallow saucer” is
neither susceptible to filling with water nor capable of becoming a dangerous
attractive nuisance.


¶ 38.        
Neighbors argue that the court’s interpretation is too restrictive and
that the court erroneously conflated the terms “pit” and “steep slope,” thereby
failing to serve the purpose of restoring the landscape to its pre-extraction
condition.  They argue that this interpretation ignores the common usage
of the term and fails to achieve the bylaw’s landscape-remediation goals. 
Neighbors further argue that the ZBA’s 2008 decision broadly interpreting the
term should receive deference.  Lathrop counters that neighbors’
interpretation is irreconcilable with the bylaw’s definition of “steep slope,”
reasoning that a “pit” must have at least a “one to two” slope.  Lathrop
further counters that because the 2004 and 2008 ZBAs reached opposite
conclusions, it is clear that the term is ambiguous and that the environmental
court’s interpretation is reasonable and entitled to deference.  We agree
with neighbors and uphold the 2008 ZBA’s interpretation of § 526(2).


¶ 39.        
As stated above, we review questions of law de novo and factual findings
for clear error, and we also review interpretations of zoning ordinances for
clear error.  Supra, ¶ 21.  We interpret zoning
ordinances under the principles of statutory construction and resolve ambiguity
in favor of the landowner.  Supra, ¶¶ 22, 29.


¶ 40.        
At the heart of the parties’ dispute is not just the definition of pit
but where to look for that definition.  The briefs and decisions below
supply a laundry list of dictionary definitions, and the language of § 526
has been picked apart to discern some meaning.  What has been overlooked
completely, however, is the reference to “pit” in § 130, the definition
section of the bylaws.  See In re Burlington Airport Permit, 2014
VT 72, ¶ 21, ___ Vt. ___, 103 A.3d 153 (“[A] word used throughout an act
or statutes in pari materia bears the same meaning throughout the act, unless
it is obvious that another meaning was intended.” (quotation omitted)). 
“Pit” is cross-referenced with “quarry,” which broadly encompasses
stone-extraction operations and expressly includes sand and gravel removal. 
Bylaws § 130.  Thus, “pit” can be defined as the resulting cavity
created by the extraction activities defined under “quarry.”  The 2008
ZBA’s interpretation—that pits result from open-pit techniques employed in
quarrying and similar extraction activities—aligns with this definition.


¶ 41.        
Having a definition provided within the bylaws, we need not resort to
dictionary definitions.  See Franks v. Town of Essex, 2013 VT 84,
¶ 8, 194 Vt. 595, 87 A.3d 418 (“Words that are not defined within a
statute are given their plain and ordinary meaning, which may be obtained by
resorting to dictionary definitions.”).  We nonetheless conclude that the
§ 130 definition fits comfortably within the ordinary understanding and
common usage of the term.  The 2004 ZBA supplied two very restrictive
definitions of “pit,” while the 2008 ZBA furnished a large number of broader
definitions—e.g., hole, cavity, indentation, excavation—that capture the term
in its most ordinary sense.  The definitions selected by the 2004 ZBA
require that pits have almost vertical or perpendicular slopes, but nothing in
§ 130 suggests this restrictive reading.


¶ 42.        
The environmental court provides an equally restrictive interpretation,
not through dictionary definitions but from § 526(7), which seemingly
defines “steep slopes” as having a rise of 1:2 or greater.  The court’s
rationale derives from the public safety concerns implied in § 526(7)’s
requirement that steep slopes be fenced.  While these public safety
concerns are valid, and an interpretation founded on such concerns may be
reasonable, the court still overlooks both the § 130 definition, which
makes no mention of steep slopes, and the remediation goals evinced within
§ 526.  In addition, as neighbors point out, the environmental court
improperly conflated the terms “pit” and “steep slope.”  Because the terms
are separated by “or” they must be read disjunctively and given separate
meanings.  Loughrin v. United States, ­___ U.S. ___,134 S. Ct.
2384, 2390 (2014).


¶ 43.        
Moreover, the effect of the court’s interpretation is to nullify the
bylaws’ refill requirement.  It will always be easier and less expensive
to create slopes that meet the degree-of-steepness requirement than to refill a
pit.  For example, if Lathrop were to excavate a cavity that resembles a
box with horizontal dimensions of 1000-by-1100 feet and a uniform depth of 100
feet, it would remove 110 million cubic feet of material.  It would then
have to refill the pit with that same amount of material.  Lathrop could
create, however, the “one to two” sloped walls with roughly one-third of the
material, obviously a less expensive alternative.  While the difference
depends on the amount of extraction, the creation of sloping walls will always
be easier and less expensive than refilling the cavity.  It is
unreasonable to conclude that the Town created a bylaw requirement that is
never applicable, except in theory.  We therefore conclude that the 2004
ZBA’s and environmental court’s interpretation of § 526(2) is clearly
erroneous, and we uphold the 2008 ZBA’s interpretation of the bylaw.


¶ 44.        
Having resolved the legal question that the court’s definition of “pit”
is incorrect, and having provided the proper definition, we must consider the
factual question of whether Lathrop’s project will result in a pit under this
definition.  We review mixed questions of law and fact de novo.  See Luck
Bros., Inc. v. Agency of Transp., 2014 VT 59, ¶ 26, ___ Vt. ___, 99
A.3d 997 (stating that our review of mixed questions of law and fact is
nondeferential and on-the-record).  Under a broad reading of pit, as
defined by the 2008 ZBA, even a “shallow saucer” with 1:10 slopes would
constitute a pit because it would be a depression in the landscape that does
not blend with the surrounding contours.  The vertical-walled cavity
described in the above hypothetical would produce approximately 4.08 million
cubic yards of material.  The environmental court found that Lathrop
proposes to extract 2.67 million cubic yards of material, roughly two-thirds the
amount of material that would be extracted from the hypothetical
vertical-walled cavity.  Except by focusing on the slope of the walls, as
the environmental court did, it is difficult to see how one cavity is a pit
while the other is not.


¶ 45.        
Again, we emphasize that the environmental court’s rationale that the
resulting cavity would not threaten public safety or fill with water is not
part of the analysis.  The site will be excavated for the removal of sand
and gravel with an open-pit technique; this is precisely the type of activity
targeted under the definition of “quarry,” as incorporated by reference into
the definition of “pit.”


¶ 46.        
We therefore reverse the environmental court’s decision and hold as a
matter of law that Lathrop’s project creates a “pit” within the meaning of
§ 526(2).


¶ 47.        
While we have reversed the environmental court’s decision that the
project would not create a pit, this holding does not end the inquiry into
whether the project violates § 526(2) of the bylaws.  The ZBA denied
the zoning permit because it ruled that Lathrop failed to make provisions to
refill the pit.  Lathrop claimed in its statement of issues on appeal to
the environmental court that the ZBA should not have denied the permit but instead
should have imposed a permit condition requiring compliance with
§ 526(2).  At the environmental court, Lathrop argued that its
proposal to regrade the land for future development was a sufficient provision
for refilling a pit and therefore satisfied the requirement of
§ 526(2).  The court never reached these arguments because it
concluded that the project would not create a pit.  Accordingly, the case
is remanded to the environmental court to address Lathrop’s other compliance
claims.  Because our holding with respect to § 526(2) does not end
the controversy, we consider the other issues raised in the appeal.


III.


¶ 48.        
We next address the issue of whether the environmental court was
precluded from hearing and adjudicating Lathrop’s revised permit application or
issuing a judgment inconsistent with the 2004 permit issued by the ZBA. 
Neighbors argue that, because the application Lathrop finally presented to the
environmental court in Lathrop II is not substantially different from
the application it submitted to the ZBA in 2003 in Lathrop I, it should
be barred by the successive-application doctrine.  Lathrop responds that
the successive-application doctrine is premised on the local board denying
the initial application, not approving the application, as occurred
here.  Moreover, Lathrop argues that its revised application indeed was
substantially different, as recognized by the ZBA when it reviewed the new
application in 2008.  The environmental court agreed with Lathrop and
concluded that it had jurisdiction to review the application.  We disagree
with the court’s analysis and reverse and remand on this issue as explained in
more detail below.[12]


¶ 49.        
Because resolution of this issue will require a full analysis of all the
principles related to issue and claim preclusion in zoning cases, we start with
an explanation of what was presented and what was either allowed or disallowed
in the three adjudications—the first adjudication by the 2004 ZBA, the second
adjudication by the 2008 ZBA, and the third and final adjudication by the
environmental court.


¶ 50.        
We have attached to this opinion, as the Appendix, a chart containing
for each important component of the project an entry describing the component:
(1) in the 2003 application to the ZBA (as amended in 2004); (2) in the ZBA’s
2004 decision approving the proposal with conditions; (3) in the second
application to the ZBA in 2007; (4) in the amended proposal to the
environmental court; and (5) as conditioned in the environmental court’s
decision.[13]
 As an overview, the project as approved by the ZBA in 2004 and the
project as proposed by Lathrop in 2007 differ in two primary respects: (1) the
extraction rate and its consequences and (2) the location of the access
point.  


¶ 51.        
The first main difference is the extraction rate and the consequences
that flow from the changed rate.  In its 2003 application, Lathrop
proposed to extract only 60,000 cubic yards per year.  In its 2007
application, Lathrop proposed 60,000 cubic yards per year only for the first
fifteen years; it proposed to excavate 100,000 cubic yards per year
thereafter.  To accommodate the increased excavation rate, Lathrop
proposed doubling the average and maximum allowable truck trips and lengthening
the hours of operation.  The 2004 ZBA allowed, as proposed by Lathrop, an
average of 17 truckloads per day with a maximum peak of 34 truckloads per
day.  The 2007 proposal sought an average of 36 truckloads per day, with a
peak of 72 truckloads per day.  This higher number of truckloads was
proposed for the entire duration of the project, not just after the fifteenth
year when the extraction rate would increase.


¶ 52.        
The second main difference is the location of the access point. 
The 2003 proposal provided access off South Street on the northern edge of the
property.  The 2007 proposal changed the access point to Rounds Road on
the southern edge of the property.  Trucks leaving the property by either
exit would reach Hewitt Road proceeding west from the project, but would reach
that road by different routes.  Due to this relocation of the access
point, different adjacent property owners would be exposed to truck traffic
along the route between the project site and Hewitt Road.


¶ 53.        
On appeal from the 2008 ZBA decision denying its permit, Lathrop
presented a virtually identical proposal to the environmental court.  It
then modified its proposal to change the location of the access point back to
the South Street route approved by the 2004 ZBA.  In all other respects
the proposal was identical to the proposal that Lathrop made to the ZBA in
2007.[14] 
Except in relatively minor respects the environmental court approved Lathrop’s
proposal.


¶ 54.        
With this overview in mind, we proceed to the applicable law.  Two
preclusion doctrines are implicated in this decision: the standards and restrictions
on zoning permit amendments and the successive-application doctrine.  Each
of these doctrines is governed by and must be consistent with the controlling
statute, 24 V.S.A. § 4472(d), which provides:


  Upon the failure of any interested
person to appeal to an appropriate municipal panel under section 4465 of this
title, or to appeal to the Environmental Division under section 4471 of this
title, all interested persons affected shall be bound by that decision or act
of . . . [the administrative] officer, the provisions or
the decisions of the panel, as the case may be, and shall not thereafter
contest, either directly or indirectly, the decision or act, provision, or
decision of the panel in any proceeding, including any proceeding brought to
enforce this chapter.


This statutory requirement underlies all preclusion rules in
zoning cases.  It is very broadly stated, applying to decisions of both
the local administrative officer and the local hearing panel—here the
ZBA.  With respect to the ZBA, it insulates from collateral attack any
decision or act of the ZBA and defines collateral attack to include both direct
and indirect challenges.


¶ 55.        
Before analyzing the two preclusion doctrines, we address one
application of § 4472(d) that is important to this case: that permit
conditions or amendments may be challenged on appeal but cannot be attacked
collaterally.  In Village of Woodstock v. Bahramian, 160 Vt. 417,
631 A.2d 1139 (1993), a zoning applicant appealed to the superior court a
denial by the local planning commission of amendments to its preexisting
permit.  Without filing a cross-appeal, the Village of Woodstock sought
reversal of other amendments approved by the planning commission but not part
of the applicant’s appeal.  The superior court concluded that because its
review under § 4472(d) is de novo, it could consider the entire
application, including those amendments challenged by the Village.  We
held that the superior court erred in reviewing the entire application because,
as the Village did not appeal, “the alterations that were approved by the
commission were not properly before the court.”  Id. at 424, 631
A.2d at 1133; see also In re Hildebrand, 2007 VT 5, ¶ 11, 181 Vt.
568, 917 A.2d 478 (mem.) (stating that unappealed permit conditions are final
under 24 V.S.A. § 4472 and may not be challenged collaterally); In re
Garen, 174 Vt. 151, 156, 807 A.2d 448, 451 (2002) (stating that issues on
appeal to environmental court are limited to those identified in statement of
questions filed in connection with notice of appeal).


¶ 56.        
The first preclusion doctrine implicated in this case deals with the
standards and restrictions on zoning permit amendments, which we have held are
allowable under 24 V.S.A. § 4472(d).  Hildebrand, 2007 VT 5, ¶ 12.
 There are no statutory standards that an amendment to a zoning permit or
condition must meet; nor in this case do the Town’s bylaws establish any
standards.  We first considered the availability of permit amendments to
zoning and other land use permits in In re Stowe Club Highlands, 166 Vt.
33, 687 A.2d 102 (1996).  In Stowe Club Highlands, upon review of
an Act 250 proceeding, we determined “under what
circumstances . . . permit conditions may be
modified.”  Id. at 37, 687 A.2d at 105.  Our decision
generally affirmed the reliance on factors that had been identified by the
former Environmental Board: (1) whether there had been “changes in factual or
regulatory circumstances beyond the control of a permittee”; (2) whether there
had been “changes in the construction or operation of the permittee’s project,
not reasonably foreseeable at the time the permit was issued”; and (3) whether
there had been “changes in technology.”  Id. at 38, 687 A.2d at
105.  These factors are intended to “assist in assessing the competing
policies of flexibility and finality in the permitting process.”  In re
Nehemiah Assocs., 168 Vt. 288, 294, 719 A.2d 34, 37 (1998).  We
applied the holding of Stowe Club Highlands to a municipal zoning permit
in Hildebrand.  In Hildebrand, we affirmed the environmental
court’s importation of the Stowe Club Highlands factors on the reasoning
that the competing interests in Act 250 and municipal zoning cases are so
similar.  Hildebrand, 2007 VT 5, ¶ 13.


¶ 57.        
That our authorization of permit amendments is a liberalization of
preclusion rules is demonstrated by In re Dunkin Donuts, 2008 VT 139,
185 Vt. 583, 969 A.2d 683 (mem.).  There, the applicant had sought
unsuccessfully to build a Dunkin Donuts restaurant with a drive-through window
but finally obtained a permit by eliminating the window from its
proposal.  A neighboring business appealed the board’s grant of the permit
and settled the appeal pursuant to a stipulation that the project would not
include drive-through service.  The settlement was incorporated into a
court judgment.  Nonetheless, the applicant thereafter applied for and was
granted an amendment to install a drive-through window.  On appeal, the
environmental court reversed the decision of the development review board, holding
that the issue of drive-through service was controlled by the original court
judgment and that the judgment could be set aside only by meeting the standards
for relief from judgment contained in Vermont Rule of Civil Procedure
60(b).  Id. ¶¶ 2-5.  Although the environmental court’s
decision could be viewed as a routine application of § 4472(d), we
reversed on the basis that preclusion applies flexibly to administrative
proceedings.  Id. ¶ 7.  As explained infra,
¶ 64, we applied the successive-application doctrine to an amendment
request, but we held that the development review board could amend the prior
permit so long as the amendment addressed the concerns that prevented approval
of the drive-through window in the original proposal.  Id.
¶ 13.


¶ 58.        
The second preclusion doctrine implicated here is the
successive-application doctrine.  This preclusion doctrine provides that a
local board “may not entertain a second application concerning the same
property after a previous application has been denied, unless a substantial
change of conditions had occurred or other considerations materially affecting
the merits of the request have intervened between the first and second
application.”  In re Carrier, 155 Vt. 152, 158, 582 A.2d 110, 113
(1990) (quotation omitted); see also In re Woodstock Cmty. Trust & Hous.
Vt. PRD, 2012 VT 87, ¶ 4, 192 Vt. 474, 60 A.3d 686.  The second
application can be granted “when the application has been substantially changed
so as to respond to objections raised in the original application or when the
applicant is willing to comply with conditions the commission or court is
empowered to impose.”  In re Carrier, 155 Vt. at 158, 582 A.2d at
113.  In an attempt to balance the competing concerns of flexibility and
finality in zoning decisions, the successive-application doctrine carves an
exception out of the otherwise rigid standard of preclusion of § 4472(d)
to allow local boards the ability to respond to changing circumstances that
often arise in zoning decisions.  In re Woodstock Cmty. Trust, 2012
VT 87, ¶ 4; In re Dunkin Donuts, 2008 VT 139, ¶ 9.  The
policy behind preclusion is to “protect the courts and the parties from the
burden of relitigation.”  Russell v. Atkins, 165 Vt. 176, 179, 679
A.2d 333, 335 (1996).  The successive-application doctrine in particular
encourages applicants “in the interest of finality and judicial economy” to be
thorough in their initial applications.  In re Armitage, 2006 VT
113, ¶ 10, 181 Vt. 241, 917 A.2d 437.


¶ 59.        
In general terms, the amendment rules are an application of issue
preclusion, or collateral estoppel, in the less-rigid environment of zoning
adjudication—they apply to the issues actually resolved in the adjudication
process and reflected in the decision on the permit application.  The
successive-application doctrine is an application of claim preclusion, or res
judicata, in the special environment of zoning adjudication—it applies to the
overall claim that the project is entitled to a permit.[15]  They should be viewed as flexible
applications of the comprehensive standard of § 4472(d) that allow changes
in proposals or permits without destroying the finality of decisions on which
both interested parties and the public rely.


¶ 60.        
In essence, the environmental court held that neither of the specific
preclusion doctrines applied and, as a result, no preclusion was
involved.  It found that the permit amendment requirements did not apply
because Lathrop never had sought a permit amendment,[16] and it found that the
successive-application doctrine did not apply because Lathrop had not been
denied a permit in 2004.  The court did not address whether § 4472(d)
imposed any restrictions on its actions, given that the successive application
and permit amendment requirements did not apply.  


¶ 61.        
The court did focus on the permit conditions imposed in Lathrop I
by the 2004 ZBA, but the rationale for the court’s decision on this point is
not entirely clear beyond its apparent reliance on the Lathrop II 2008
ZBA decision that the second application “differs substantially” from that
approved in 2004 and the fact that Lathrop’s 2004 permit was not denied. 
The court went on to state that Lathrop raised on appeal “whether the original
conditions imposed by the ZBA are appropriate” and that it concluded that
Lathrop “preserved its ability to assert that its revised project conforms to
the Bylaws without condition.”[17] 
It went on to state that it would consider conditions “which may or may not
coincide with the twenty-three conditions the ZBA imposed in its approval of
Lathrop’s original proposal.”


¶ 62.        
The logic of the environmental court’s decision takes us in the wrong
direction.  If the flexible preclusion doctrines do not apply, we must
analyze the circumstances under 24 V.S.A. § 4472(d), with a result
directly contrary to that of the environmental court.  The Lathrop II
application contests, at least indirectly, the decision of the 2004 ZBA in Lathrop
I, to the extent that there is an inconsistency between them.  Thus,
it violates § 4472(d), and the ZBA should not have entertained it.


¶ 63.        
The reason that the environmental court’s decision goes in the wrong
direction is that it elevates form over substance.  As neighbors note, the
Lathrop I decision could have been expressed either as a denial
of a permit until certain conditions are met or as an approval of a
permit so long as certain conditions are met.  It is illogical to reject
the use of the successive-application doctrine in one instance and not the
other.  Similarly, it is illogical to apply one standard when a permit
holder seeks an amendment to the permit and another when a permit holder seeks
a new permit, the purpose of which is to amend the conditions in the
preexisting permit.  The preclusion doctrines should apply when the
circumstances to which they respond arise, and not based primarily on the form
of the action that the applicant seeks or the form of the earlier action of an
adjudicatory panel.  In a complex case like this one, it is possible, even
likely, that both preclusion doctrines should apply, just as it is possible
that in civil litigation both issue and claim preclusion can be involved.


¶ 64.        
Our decision in Dunkin Donuts illustrates the flexibility both in
the preclusion doctrines and in how they are employed.  Although that case
involved a permit amendment, we applied the successive-application doctrine,
even though there never was a permit denial.  Our holding there directly
responded to the environmental court’s holding that the successive-application
doctrine does not apply when a permit has been granted.  More importantly,
we broadly applied the successive-application doctrine because we had not yet
held that the standards for permit amendments developed for Act 250 proceedings
in Stowe Club Highlands also apply to zoning cases.  See In re
Dunkin Donuts, 2008 VT 139, ¶ 9 n.2 (citing Stowe Club Highlands
but explaining that “an independent set of rules, not the
successive-application doctrine, are applied to Act 250 permit amendment
requests”).  After our decision in Hildebrand, applying the Stowe
Club Highlands standards for permit amendments, Dunkin Donuts should
be viewed as a permit amendment case.  Dunkin Donuts is important,
however, because of its flexible use of the successive-application doctrine in
applying preclusion principles.


¶ 65.        
A good example of the proper application of preclusion doctrines to
facts like those before us is DeTray v. City of Olympia, 90 P.3d 1116
(Wash. Ct. App. 2004).  In DeTray, the developer sought a permit
for a mobile home park abutting a lake and accessible via a private road. 
The developer received the necessary permit with two conditions: one requiring
dedication of the private road as a public road and a second requiring creation
and dedication of an extension of an existing pedestrian trail around the
lake.  The developer appealed, attempting to strike the conditions, but
later abandoned the appeal.  Thereafter, the developer submitted a new
proposal, which he called a modification of the previous application, that
reduced the number of mobile homes, added a senior citizen apartment building,
and also included the public road and pedestrian trail extension.  The
developer received permits for this proposal but again appealed, seeking to
strike the public road and pedestrian trail extension requirements.  In
response to the city’s argument that he was precluded from again challenging
the requirements for failure to continue the appeal from the earlier permit,
the developer responded that the new proposal was such a substantial change
from the earlier one that no preclusion applied.  The court rejected the
developer’s argument and held that a substantial change in the overall
development proposal is not sufficient to allow the striking of the original
permit conditions, especially where the new proposal increased the need for
those conditions.  Id. at 1123.  The court stressed that the
failure of the developer to pursue his original appeal made the conditions
final and that claim preclusion prevented the developer from challenging them
in this new successive application.  Id. 


¶ 66.        
The case before us should proceed similarly.  Where there is a
preexisting permit, it should not matter to applicable regulatory standards
whether the applicant submits a new application or requests an amendment to an
existing permit.  The first step is to determine whether there is a judgment
with preclusive effect.  If so, the second step should be review of the
proposal as a whole.  If the board or court concludes that there is a
substantial change from the permitted project,[18] review should proceed as if there is no
prior permit.  In the relaxed environment of zoning permits, it is not
determinative that the applicant could have or should have made the new
proposal at the time of the original permit review.  The third step is
that conducted for permit amendments.  To the extent the applicant seeks
to change or avoid permit restrictions or conditions, the applicant must meet
the standards for permit amendments as set forth in Hildebrand[19] in light of the new project and any
restrictions and conditions imposed from the second step.  


¶ 67.        
Looking at the first step in this case, there is a judgment—the 2004 ZBA
permit—with preclusive effect as specified in 24 V.S.A. § 4472(d). 
While the permit is not final because of neighbors’ appeal, it is final with
respect to any change from Lathrop because Lathrop failed to appeal.  This
result is commanded by Bahramian as described above, supra,
¶ 55.


¶ 68.        
The ZBA conducted the second step of the review in 2008, and the
environmental court relied upon that review to reach its conclusions and
order.  The ZBA review was conducted, however, with respect to a proposal
that was significantly different from that approved by the environmental
court.  As we discussed above, supra, ¶¶ 51-52, the two main
differences between the 2007 proposal and the 2004 ZBA approval were the annual
extraction rate and the location of the access point.  Under the
environmental court’s order, the project essentially has returned to that approved
in 2004 with respect to these two issues.[20]  Before the court can consider the
project as approved, a substantially different project under the
successive-application doctrine, it must analyze the differences from the 2004
permit and find the necessary substantial change.


¶ 69.        
Even if Lathrop is allowed to go further after the second step of
review, the conditions and restrictions must be reviewed as permit amendments
in light of the changed project.  Neither the ZBA nor the environmental
court conducted this third step of the review.  Assuming it is necessary
at all, we leave that review to the environmental court on remand.  We do
address, however, the truck-travel limits as imposed by the ZBA in 2004 because
it is a central point of this appeal and can be resolved as a matter of law.


¶ 70.        
The 2004 ZBA decision imposed a permit condition that “[g]ravel may be
removed from the site at a rate of 17 loaded trucks/day averaged over 250 days
of operation, with 34 trucks per day maximum.”  The environmental court
judgment order provided that “Lathrop shall
restrict . . . the maximum one way truck trips to no more
than 100 per day unless and until authorized by both the District Commission
and the ZBA to increase such limits.”[21] 
The decision notes that the trip-rate maximum proposed by Lathrop would mean
that Lathrop would reach the extraction maximum of 60,000 cubic yards if truck
traffic were at its maximum, given the size of the trucks Lathrop would
use.  It found that an average of 23 truck trips per day would allow for
the excavation and transportation of 60,000 cubic yards.  It noted,
however, that if the extraction rate increased to 100,000 cubic yards per year
it would take an average of 38 truck trips per day to transport that
material.  In its findings, it added that “[w]e have some concern, perhaps
best explained as uncertainty, of the impact to area highways if the truck
traffic from the proposed project continues at the projected maximum rate for
more than sixty-two days a year.”


¶ 71.        
Based on the above findings and drawing on the expert testimony and the
historic truck traffic on Hewitt Road, the court concluded that a “maximum
level of 100 one-way truck trips generated per
day . . . will not cause unreasonable congestion or unsafe
conditions on the town highways.”  See 10 V.S.A. § 6086(a)(5) (Act
250 Criterion 5 (traffic)).  The conclusion goes on to state that Lathrop
can apply after fifteen years for an increase in the excavation rate and
truck-trip maximum.  At that time, there will be better evidence of the
impacts of the truck traffic.


¶ 72.        
While we have no doubt that Lathrop presented a much better and more
thorough case to the environmental court in 2012 than it presented to the ZBA
in 2004, we see nothing in the court’s findings and conclusions to support a
permit amendment with respect to truck traffic.  As we held with respect
to the successive-application doctrine, and it applies equally here, an
applicant seeking a permit amendment may not merely introduce new evidence that
it could have presented in the initial proceeding.  In re Armitage,
2006 VT 113, ¶ 10.


¶ 73.        
As in DeTray, the main question is whether the permit amendment
is motivated by changes in construction or operation of the project not
reasonably foreseeable at the time the permit was issued, one of the three
critical factors in Hildebrand, 2007 VT 5, ¶ 7.  The testimony
regarding the contested application conditions indicates that no such change in
circumstances occurred, but rather that Lathrop finds the conditions
impractical.  As we look at the changes in the project from 2007 through
the environmental court’s approval, we see none that suggests or supports
loosening the truck-traffic limit.  Under the circumstances, we hold that
the grounds for a permit amendment were not established and the court erred in
changing that limit from where it was set by the 2004 ZBA.


IV.


¶ 74.        
We next address the issue of whether the environmental court erred in
relying on one-hour average noise levels and failing to consider an increase in
high-decibel noise events, or instantaneous peak noise levels.  The
environmental court’s analysis with respect to this issue goes to whether the
project will have an adverse aesthetic impact under Act 250 Criterion 8, which
the former Environmental Board and this Court have held covers noise
impacts.  See In re Chaves A250 Permit Reconsider, 2014 VT 5,
¶¶ 23-24, ___ Vt. ___, 93 A.3d 69.  An analysis of a project’s
aesthetic impacts under Criterion 8 begins with the two-part Quechee
test formulated by the Environmental Board in In re Quechee Lakes Corp.,
Nos. 3W0411-EB, 3W0439-EB, slip op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985),
http://www.nrb.state.vt.us/lup/decisionis.htm.  Under the Quechee
test, a project violates Criterion 8 if: (1) the proposed project will have an
adverse aesthetic impact and (2) that impact will be undue.  In re
Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336, 950 A.2d
1189.  An impact is undue if: (1) it “violate[s] a clear, written
community standard intended to preserve the aesthetics or scenic, natural
beauty of the area”; (2) it “offend[s] the sensibilities of the average
person”; or (3) the applicant has “failed to take generally available
mitigating steps that a reasonable person would take to improve the harmony of
the proposed project with its surroundings.”  Id.  


¶ 75.        
We reiterate that our evaluation of this claim, as others, is limited by
our standard of review.  We defer to the environmental court’s expertise
in matters of land-use permitting and its conclusions on the impacts a proposed
project will have on the environment.  In re Rte. 103 Quarry, 2008
VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694.  It is the role of the
environmental court to weigh the evidence and assess the credibility of the
witnesses with respect to these impacts, In re McShinsky, 153 Vt. 586,
589-90, 572 A.2d 916, 918-19 (1990), and we will uphold the court’s conclusions
so long as it has not abused its discretion.  In re Chaves, 2014 VT
5, ¶ 30.  The court's conclusions, however, must be supported by the
factual findings.  Turnley v. Town of Vernon, 2013 VT 42,
¶¶ 11-12, 194 Vt. 42, 71 A.3d 1246.  


¶ 76.        
Before we analyze the environmental court’s decision, we emphasize that
the issue is limited only to noise from truck traffic under Act 250. 
There is an apparent conflict between the 2004 ZBA permit condition with
respect to noise from the project site and the permit condition imposed by the
environmental court.  The ZBA set a limit of 55 dB at the property line,
which seemingly excludes noise from truck traffic outside the project site,
while the environmental court set a limit of 70 dBA at the property line.[22]  As we held in Part III, supra,
¶ 66, this conflict must be resolved by treating any higher noise limit as
a zoning permit amendment that must meet the standard for such
amendments.  Neighbors have not raised this conflict in particular, and it
is not the basis of this issue with respect to truck-traffic noise under Act
250.


¶ 77.        
The crux of the parties’ dispute here is the use of two different noise
measurements for assessing the traffic impacts under Criterion 8.  The
first measurement is the Lmax, which is the maximum noise level that will occur
irrespective of its duration.  In re McLean Enters. Corp., No.
2S1147-1-EB, slip op. at 22 (Vt. Envtl. Bd. Nov. 24, 2004), http://www.nrb.state.vt.us./lup/decisions.htm. 
Simply put, Lmax measures instantaneous noise.  Id.  The
second measurement is the Leq(n), which is the maximum noise level that will
occur as averaged over a period of time (n).  Id.  Both the
Lmax and Leq are measured in decibels (dB or dBA).  Neighbors essentially
argue that noise impacts under Criterion 8 should be evaluated under the Lmax
standard for instantaneous noise, with particular concern about noise emitted
from truck traffic along Hewitt Road.  The environmental court instead
applied the Leq standard, which neighbors claim was averaged over a period of
one hour.  Although the court never explicitly stated the duration of the
Leq measurements, neighbors point out that the court used predicted noise levels
drawn from the testimony of Lathrop’s expert witnesses.


¶ 78.        
The environmental court recognized that former Act 250 decisions under
Criterion 8 consistently have assessed noise impacts using the Lmax
measurement, but the court relied on testimony from Lathrop’s expert witnesses
that the average Leq noise levels emitted by passing trucks, although
discernible to residents, likely would not exceed the existing background
levels.  Specifically, the court found that Lathrop’s haul trucks will
emit noise at a level of 70 dBA (Leq) at the edge of the roadway and 56 dBA
(Leq) at residences and outside areas of frequent human use, and that the
average noise levels recorded at monitoring stations along nearby roads
reported existing levels of 55-57 dBA (Leq).  On that basis, the court
concluded that the noise emitted from the truck traffic would not be undue,
thereby satisfying Criterion 8.[23]
 The court made no findings as to the Lmax and did not consider Lmax
measurements in reaching its conclusion.  


¶ 79.        
Neighbors do not contest the court’s findings with respect to the
existing traffic and background noise levels, the average and maximum traffic
that may be generated by the project, or the potential increase in decibel
levels emitted by the additional traffic.  Rather, neighbors dispute the
environmental court’s conclusion that the traffic generated by Lathrop’s
project will not emit noise that will create an undue adverse impact on
neighbors and the surrounding area.  Specifically, neighbors argue that
the undue adverse impact will be created by the higher frequency of peak noise
levels, especially during times that existing traffic is low, notably during
the project’s operating season, and during the warm season when windows and
doors are open and people spend more time outdoors.


¶ 80.        
As the environmental court acknowledged, the Environmental Board
formulated a standard for determining at what point a noise event is adverse:
where the noise exceeds 70 dBA (Lmax) at the property line and 55 dBA (Lmax) at
surrounding residences and outside areas of frequent human use.  In re
Barre Granite Quarries, LLC, No. 7C1079 (Revised)-EB, slip op. at 80 (Vt.
Envtl. Bd. Dec. 8, 2000), http://www.nrb.state.vt.us./lup/decisions.htm. 
This standard has guided Act 250 determinations over the past decade, and we
recognized the standard in Chaves, 2014 VT 5, ¶ 31 n.4.


¶ 81.        
Although the environmental court recognized this standard, it emphasized
that the standard should not be applied rigidly.  The court cited McLean
Enterprises, No. 2S1147-1-EB, in which the Environmental Board acknowledged
that the context and setting of a project should aid in dictating the
appropriate noise levels.  Id. at 64.  As the Board stated, “a
50 dBA Lmax standard may not make sense in noisy
areas . . . .  It may be of questionable logic
and practically impossible to enforce a 50 dBA Lmax when trucks passing
by . . . already register 78 dBA at an adjacent
residence.”  Id.


¶ 82.        
We endorsed this flexibility in Chaves, 2014 VT 5, where we
reviewed a claim quite similar to the one at issue here.  The project
neighbors in Chaves, who owned a country inn located across the highway
from the quarry entrance, claimed that the environmental court erred in
concluding that a proposed sand and gravel quarry satisfied Criterion 8 because
the noise resulting from the truck traffic would exceed the maximum 55 dBA
level established under Barre Granite.  We disagreed with the
neighbors’ claim, even though the applicant’s expert witness conceded that
trucks accelerating past the neighbors’ inn would produce sounds up to 69 dBA,
and stated that “[t]his statement does not undermine the court’s overall
finding that noise levels would generally remain under 55 dBA and that the
noise was not adverse to the area’s aesthetics.”  In re Chaves,
2014 VT 5, ¶ 33.  We also noted that the noise expert explained that
the existing truck traffic already emitted noise up to 68 dBA and that the 1
dBA difference is insignificant.  Id.  We concluded:


From this evidence, the court found that
in those instances where the noise exceeded the 55 dBA standard, the Project
noises will be no louder than the discernible noises from the Route 100 traffic
and activities on surrounding properties.  Essentially, even though
applicants’ experts testified that in some instances the noise from trucks
leaving the quarry could exceed 55 dBA, the character of the area already
included significant traffic noise at or near the level of those exceedances
and therefore a slight increase in the traffic noise would not amount to an
adverse impact.


Id. (quotation
omitted).  The neighbors in Chaves also argued that the court erred
in looking at the average rather than the maximum number of trips that may be
generated by the proposed project.  We again disagreed with the neighbors
and stated that the court considered both the average and maximum “but credited
applicants’ expert that if this level of operation were maintained, the project
would operate on only forty-eight days, given the limit on
extraction . . . [and] that it was more likely that
extraction and traffic would be spread across an operating season.”  Id.
¶ 28.


¶ 83.        
Lathrop argues that the Chaves decision controls and decides the
issue here.  We do find Chaves helpful in creating the parameters
within which the environmental court can exercise its discretion, but we
ultimately conclude that it is distinguishable and thus not controlling
here.  First, while the environmental court in both Chaves and in
this case considered the preexisting overall background averages and concluded
that the noise emitted by the truck traffic would remain within those averages,
the court in Chaves conducted a more thorough analysis, looking at not
only the overall averages but also the Lmax, as required under the Barre
Granite standard.  The Chaves court made findings as to the
Lmax and concluded that the 1 dBA increase over the maximum existing noise from
passing traffic would not be adverse in the context of the industrial
setting.  Here, the environmental court made no findings as to the Lmax,
considering only the Leq, despite testimony from Lathrop’s noise expert that
the instantaneous noise emitted by passing traffic would exceed the 70 dBA Lmax
standard.  


¶ 84.        
Second, Chaves dealt with preexisting traffic on a major road,
and there is no indication in the opinion that there was seasonal variation in
traffic volume or noise.  The court there considered the increase in
traffic generated by the quarry and the noise experts’ testimony that the
additional trips would increase the noise level by less than 3 dB.  In
this case, the trucks travel along secondary roads—South Street and Hewitt Road—and
primarily during a different operational season from the preexisting truck
traffic generated by Lathrop Forest Products.  From this, the
environmental court concluded that the truck traffic would “mesh conveniently”
with the existing traffic and not increase the overall average noise levels,
even though neighbors complain that the adverse impact is created by the
increased frequency of peak noises on a year-round basis.  Cf. John A.
Russell Corp., 2003 VT 93, ¶ 33 (stating that environmental court erred
in failing to consider increase in frequency of loud noises emitted by proposed
asphalt plant even though plant would not emit noise in excess of preexisting
decibel levels).


¶ 85.        
While the Barre Granite standard indeed is applied flexibly to accommodate
existing background noise and the project context, the Environmental Board
consistently adhered to Lmax calculations when assessing the adverse impact of
noise.  See, e.g., McLean Enters. Corp., No. 2S11471-EB, at
65.  The environmental court explicitly relied on McLean Enterprises
and its discussion of the need for flexibility, quoting the Board’s statement
that a permit condition of 50 dBA Lmax would be inappropriate “in a quiet rural
residential area with background noises under 30 dBA L90” and that “[i]t may be
of questionable logic and practically impossible to enforce a 50 dBA Lmax when
trucks passing by . . . already register 78 dBA at an
adjacent residence.”  Id. at 64.  We agree that the reliance
on McLean Enterprises was appropriate, see 10 V.S.A. § 8504(m)
(stating that in Act 250 appeals, prior decisions of Environmental Board “shall
be given the same weight and consideration as prior decisions of the
Environmental Division”), but the court failed to apply the full holding of McLean
Enterprises.  The Board in McLean Enterprises rejected the
applicant’s argument that the Board should use the Leq standard, rather than
the Lmax standard, in imposing permit conditions and emphasized that although
“the time period of 1 second for an Leq theoretically would result in readings
similar to a Lmax . . . the Board has historically used
Lmax.”  McLean Enters. Corp., No. 2S11471-EB, at 65.


¶ 86.        
As evidenced by the transcript, the environmental court wrestled with
the application of the Lmax standard to highway traffic, concluding that “if we
were obligated to apply the 55 dB or 75 dBA noise-level standards to traffic as
it crossed the border . . . there would be no large
development that would receive a permit in the State of Vermont.”  While our
decision in Chaves had not been issued when the environmental court made
its decision, several Environmental Board decisions have applied the Lmax
instantaneous noise level standards to truck traffic.  In In re Casella
Waste Management, Inc., No. 8B0301-7-WFP, slip op. (Vt. Envtl. Bd. May 16,
2000), http://www.nrb.state.vt.us./lup/decisions.htm, the Waste Facility Panel
of the Environmental Board found that “[i]nstantaneous sound levels (in
relation to background noise) are the appropriate standard (as opposed to
average levels over time) by which to judge noise impacts from trucks, as that
is what impacts on the human ear from truck traffic” and that “[m]aximum sound
(peak level) readings are a better indicator than average sound readings for
determining the impacts of instantaneous noise from trucks.”  Id.
at 22.  The Panel further stated that “[w]hen evaluating the real effect
on people from the noise of passing trucks, it is more appropriate to
consider the instantaneous noise from the trucks as they pass because that is
what people experience.”  Id. at 34 (quoting In re OMYA,
Inc., No. 9A0107-2-EB, slip op. at 15 (Vt. Envtl. Bd. May 25, 1999),
http://www.nrb.state.vt.us./lup/decisions.htm).  The Board in OMYA
similarly rejected average noise levels for truck traffic, emphasizing that
“[w]hile the average noise levels may not increase significantly with OMYA’s
proposed additional truck traffic, each additional instance of a truck passing
results in an additional instantaneous loud noise, or an additional annoyance
that interferes with sleep and conversations.”  In re OMYA, Inc.,
No. 9A0107-2-EB, slip op. at 15.  And in In re Bickford, No.
5W1186-EB, slip op. (Vt. Envtl. Bd. May 22, 1995),
http://www.nrb.state.vt.us./lup/decisions.htm, the Board found the traffic
noise adverse, citing the 55 dBA standard for outside areas of frequent human
use, because the haul trucks from the project site when passing the adjacent
motel cabins would emit peak noises of 85-95 dBA, a “high increase” over the
existing 42-50 dBA “no traffic” background levels.  Id. at 33.


¶ 87.        
In general, the Environmental Board decisions reflect a more thorough
analysis of the changes in traffic patterns and the attendant noise emissions
than the environmental court decision before us.  This analysis is
demonstrated in OMYA, No. 9A0107-2-EB, slip op., where the Board
considered the large increases in high-decibel noise events in relation to the
existing traffic passing through a downtown.  Id. at 37-38; see
also Bickford, No. 5W1186-EB, slip op. at 33 (concluding that, although
tourist cabins already experience traffic from state highway, increase in
instantaneous traffic noise during periods of no traffic on highway would be
adverse).  Our discussion of noise impacts in John A. Russell Corp.,
2003 VT 93, although in the context of a municipal permit, also points to a
more complete analysis.  There, the environmental court concluded that the
noise emitted by the asphalt plant, which was added to an existing quarry,
would not adversely affect the character of the area because it would be no
louder than the noise limits under the quarry’s Act 250 permit.  Id.
¶ 32.  We held that the court failed to conduct a complete analysis
because even though the court found the asphalt plant would not emit noise in
excess of the decibel levels set by the preexisting permits, it “did not
evaluate the neighbors’ complaint that the frequency of loud noise would
increase and affect the use and enjoyment of nearby residences.”  Id.
¶ 33.


¶ 88.        
We therefore conclude that the environmental court erred in not making
findings on the Lmax instantaneous noise levels emitted by the project traffic
and failing to consider the increase in frequency of high-decibel noise events
during the project’s operational season in assessing the project’s compliance
with Criterion 8.  On remand, the court should assess the evidence with
respect to high Lmax events and make findings with respect to the
evidence.  Based on those findings, it should determine whether the frequency
and amount of these events and intensity complies with Criterion 8.


V.


¶ 89.        
We next address the issue of whether the environmental court erred in
admitting and relying on the acoustical-modeling testimony under Vermont Rule
of Evidence 702 and the Daubert standard for admissibility. 
Lathrop’s expert witness testified to the noise impacts on surrounding
landowners from the site’s operations.  In doing so, the witness relied
upon acoustical modeling produced by the computer software CADNA-A.  Neighbors
moved to exclude the testimony because the software’s limitations make it
inapplicable to the type of rugged terrain on Lathrop’s parcel.  Neighbors
point to the International Organization for Standardization’s method for
calculating ground attenuation, which is implemented by CADNA-A, and its caveat
that the method “is applicable only to ground which is approximately flat,
either horizontally or with a constant slope.”  The environmental court
rejected neighbors’ assertion, finding credible the noise expert’s testimony
that the program took into account the topography and other acoustical
mitigating factors.  We need not resolve the issue of the software’s
limitations.  We conclude that the environmental court did not err in
admitting and relying on the CADNA-A acoustical-modeling testimony because,
regardless of the limitations of the software, the testimony is relevant under
Rule 702 and Daubert.


¶ 90.        
The environmental court’s decision to admit or exclude evidence is
“highly discretionary” and will be reversed “only where discretion has been
abused or withheld and prejudice has resulted.”  Griffis v. Cedar Hill
Health Care Corp., 2008 VT 125, ¶ 18, 185 Vt. 74, 967 A.2d 1141. 
Nonetheless, with respect to the admissibility of evidence under Rule 702 and
the Daubert factors, we must “engage in a substantial and thorough
analysis of the trial court’s decision and order to ensure that the trial
judge’s decision was in accordance with Daubert and our applicable
precedents.”  Lasek v. Vt. Vapor, Inc., 2014 VT 33, ¶ 9, ___
Vt. ___, 95 A.3d 447 (quotation omitted).  We are also mindful that this
is a bench trial and that although the Daubert standard is applicable,
“a judge in a bench trial should have discretion to admit questionable
technical evidence,” although the judge “must not give it more weight than it
deserves.”  USGen New Eng., Inc. v. Town of Rockingham, 2004 VT 90,
¶ 26, 177 Vt. 193, 862 A.2d 269.


¶ 91.        
Vermont Rule of Evidence 702 allows admission of scientific or technical
knowledge if it “will assist the trier of fact to understand the evidence or to
determine a fact in issue.”  Rule 702 further states that


a witness qualified as an expert by
knowledge, skill, experience, training, or education, may testify thereto in
the form of an opinion or otherwise, if (1) the testimony is based upon
sufficient facts or data, (2) the testimony is the product of reliable
principles and methods, and (3) the witness has applied the principles and
methods reliably to the facts of the case.


Our Rule 702 closely follows the
federal rule, which was delineated in Daubert, 509 U.S. 579.  The Daubert
factors have become the preeminent standard for admissibility of expert
testimony and were adopted by this Court in State v. Brooks, 162 Vt. 26,
30, 643 A.2d 226, 229 (1993).  The Daubert standard requires that
judges act as gatekeepers of expert testimony, admitting it only if it is both
reliable and relevant.  State v. Scott, 2013 VT 103, ¶ 9, ___
Vt. ___, 88 A.3d 1173.


¶ 92.        
Neighbors do not dispute the reliability of the CADNA-A
acoustical-modeling software, nor do neighbors dispute the relevancy of
acoustical modeling generally in assessing the noise impacts of the project:
indeed this goes directly to one of the major issues.  Rather, neighbors
contest the reliability of the evidence as it applies specifically to the
rugged terrain of Lathrop’s  parcel—in essence, they argue that the
evidence does not “fit” the facts of the case.  The United States Supreme
Court discussed fit in Daubert as an issue of relevancy, stating that
the expert testimony must be “sufficiently tied to the facts of the case that
it will aid the [fact finder] in resolving a factual dispute.”  509 U.S.
at 591 (quoting United State v. Downing, 753 F.2d 1224, 1242 (3d Cir.
1985)).  The Supreme Court further noted that fit “is not always obvious,
and scientific validity for one purpose is not necessarily scientific validity
for other, unrelated purposes.”  Id.  


¶ 93.        
The relevancy of the CADNA-A testimony as applicable to the facts here
is controlled by State v. Scott, 2013 VT 103, which was issued on the
same day as the environmental court’s decision.  In Scott, the
defendant was charged with grossly negligent operation of a motor vehicle, with
death resulting, because of an accident in which the defendant’s vehicle went
through a stop sign and collided with another vehicle.  The prosecution
offered the testimony of an accident-reconstruction expert who testified to the
impact speed of the defendant’s vehicle.  The expert’s calculations were
derived in part from on-site testing that involved pulling a drag sled over the
road surface and onto the grass where the vehicles had traveled.  The
defendant moved to exclude the testimony as unreliable, citing expert analysis,
including that of the American Prosecutor’s Research Institute, that the drag
sled could not be used on grass.  The expert witness testified that his
techniques were nationally accepted within his field and consistent with his
training, and he added that, while using the sled on grass “was not
ideal, . . . it was the best technique available.”  Id.
¶ 13.


¶ 94.        
We affirmed the superior court’s admission of the evidence, ruling that
the general understanding that the drag sled should not be used on grass went
to weight of the evidence and not admissibility.  Id.
¶ 14.  While we acknowledged that accuracy of the drag sled’s use on
grass was “lacking,” we concluded that “[t]his
alone . . . does not transform [its use on grass] to ‘junk
science’ to be categorically excluded under Rule 702.”  Id. 
Rather, we found that the use “qualifies as a well-reasoned but novel
application of a traditionally accepted technique” and emphasized that the
defendant had ample opportunity to explore the proper weight of this evidence
through cross-examination of the expert witness.  Id.  We
think that holding is equally applicable here.  


¶ 95.        
We are cognizant of the split in the federal courts over whether the
necessary “fit” under Daubert requires more than relevancy under Federal
Rule of Evidence 401.  See D. Herr, Annotated Manual for Complex
Litigation § 23.25 (4th ed. 2014).  In essence Scott provides
a holding that bare relevancy or something akin to bare relevancy is sufficient
for evidence to meet the fitness requirement.  While we had not addressed
the issue explicitly before Scott, our prior decisions were entirely
consistent with its holding.  See Estate of George v. Vt. League of
Cities & Towns, 2010 VT 1, ¶ 71, 187 Vt. 229, 993 A.2d 367 (applying
Vermont Rule of Evidence 401 in Daubert context); State v. Brochu,
2008 VT 21, ¶ 49, 183 Vt. 269, 949 A.2d 1035 (same); see also State v.
Burgess, 2010 VT 64, ¶¶ 12, 15, 188 Vt. 235, 5 A.3d 911 (stating that
deficiencies in expert testimony should be attacked through cross-examination
and presentation of contrary evidence); In re JAM Golf, LLC, 2008 VT
110, ¶ 9, 185 Vt. 201, 969 A.2d 47 (same).


¶ 96.        
Turning to the expert testimony here, the relevancy analysis is not
whether the acoustical modeling will help the trier of fact determine the
impact of noise on neighbors, but whether evidence of acoustical modeling with
a program limited to flat terrain will help the trier of fact determine noise
impacts of a project on rugged terrain.  Lathrop’s expert witness
testified that the CADNA-A predictions would be of assistance to the
court.  Furthermore, one could argue that noise levels predicted for flat
terrain would be too high when applied to rugged terrain because berms, hills,
and other geographical features may absorb and temper the sound; this certainly
would help neighbors’ case.  In any event, while the alleged disconnect
between the computer software and the facts here may render the testimony
deficient, it is the province of the court to then weigh the credibility of
that evidence.  Neighbors had the opportunity to cross-examine Lathrop’s
noise expert and present contrary evidence, and the environmental court aptly
considered both, ultimately finding Lathrop’s evidence more credible.


¶ 97.        
Finally, we note that it was reasonable for the court to find the
testimony of Lathrop’s noise expert that the computer software takes into
account the geography of the terrain credible, even in light of neighbors’
claim that the software is limited in application, and to rely on the
acoustical-modeling testimony in drawing its conclusions on the noise impacts
to neighbors.  Beyond that, it is not our role to second-guess the court’s
evidentiary rulings.  Rutland Herald v. City of Rutland, 2012 VT 26,
¶ 41, 191 Vt. 387, 48 A.3d 568 (stating that it is exclusive role of trial
court to weigh evidence).


¶ 98.        
We therefore conclude that the environmental court did not err in
admitting and relying on the acoustical-modeling testimony of Lathrop’s noise
expert.[24]


VI.


¶ 99.        
Finally, we turn to the issue of whether the environmental court was
required to remand the Act 250 application to the district commission to
consider project changes including the changed access point from Rounds Road
back to South Street.  Neighbors and amicus Vermont Natural Resources
Board (NRB) argue that the changed access point in particular substantially
altered the project, requiring remand to the district commission to give notice
to affected parties and consider the impacts.  The NRB additionally argues
that the court’s failure to remand contradicts the Act 250 statute and rules
and sets a precedent that diminishes the role of the district commission in Act
250 proceedings.  In opposing a remand, Lathrop primarily relies on our
decision in Chaves, 2014 VT 5, ¶¶ 13-14, where we held that the
changed access point for the sand and gravel operation did not require a
remand, and argues that we should apply its holding here.  Our standard of
review for the environmental court’s decision to remand a permit application is
abuse of discretion.  In re Maple Tree Place, 156 Vt. 494, 501, 594
A.2d 404, 408 (1991).


¶ 100.    
We start with Chaves, 2014 VT 5, our most recent Act 250 decision
to address this issue and a focal point of the parties’ arguments.  In Chaves,
we held that the site plan changes—which involved changing the access point
from a proposed new entrance to an existing access road; changing the loading
area and a related berm for noise mitigation; adding noise mitigation berms;
limiting maximum daily truck trips; and restricting the days and hours for
blasting, drilling, and crushing—were not substantial enough to require a
remand.  Id. ¶¶ 13-14.  We relied on In re Sisters and
Brothers Investment Group, LLC, 2009 VT 58, 186 Vt. 103, 978 A.2d 448, a
local zoning decision in which we held that the environmental court may review
revisions to a proposal so long as those revisions are not “truly substantial
changes to the form or type of an application.”  Id.
¶ 21.  In Sisters and Brothers, we cautioned against the
“procedural ping-pong match” that would ensue between the environmental court
and municipal board if applicants were barred from presenting minor revisions
to the court.  Id.  We further stated in Chaves that we
should encourage applicants to resolve differences with interested parties by
amending proposals to respond to issues and that it would be inefficient to
remand all changes to the district commission.  2014 VT 5, ¶ 16.


¶ 101.    
Neighbors and the NRB argue that this case is distinguishable from Chaves
because the impacts of the changed access point here are more significant than
in Chaves.  The NRB also asks that we clarify our holding in Chaves
and limit the reach of that case “in a fashion that preserves the
legislatively-intended, important role of the District Commission and does not
deprive neighbors and other interested parties of the opportunity to
participate in the Act 250 process.”  The fact in Chaves that neighbors
and the NRB highlight as distinguishable is that the amended access point was a
preexisting historically used road, while the South Street access point here
will require construction of the access road and physical improvements along
South Street.  We did emphasize in Chaves that the fact that “the
changed entry point may now impact neighbors more particularly does not amount
to a substantial change in the project itself.”  Id.
¶ 15.  We also noted that this and other project changes were
attempts to mitigate noise and traffic impacts and limit the time for
operations.  Id. ¶ 14.  Our decision there largely was
based on the fact that the neighbors had been a party to the settlement
agreement in which the changed access point was proposed, that the neighbors
had prior knowledge of the proposal, and that the neighbors were aware of the
existing access point, which had been actively used during excavation following
Hurricane Irene.  Id. ¶ 20.  In this sense, Lathrop’s
proposal is distinguishable from the facts of Chaves.  But our
analysis does not end there.  We must still determine the reach of Chaves,
and its applicability here.


¶ 102.    
The rule that we formulated in Chaves, as derived from our
consideration in Sisters and Brothers, states that a remand is not
necessary unless there are changes in the scope of the project, the location of
the project, or the nature of the permit.  Chaves, 2014 VT 5,
¶ 14.  We likened the changes made by the applicants in Chaves
to those in Sisters and Brothers for our conclusion that they were
insubstantial.  Turning to Sisters and Brothers, it is unclear just
what changes were made to the application.  The recitation of background
facts contains no such itemization of changes.  Rather, the discussion of
this issue merely provides: “[The neighbor’s] contention that the changes were
material and substantial is directly contrary to the Environmental Court’s
finding on this point.  The court expressly found that the changes were not
so material as to require remand.”  2009 VT 58, ¶ 19.  This
rule, although a helpful starting point, does not delineate just what it means
when the “scope” of the project changes.  We recently returned to this
issue in the context of local zoning in In re All Metals Recycling, Inc.,
2014 VT 101, ___ Vt. ___, ___ A.3d ___, where we addressed a revised parking
plan submitted to the environmental court that had not been presented to the
local development review board.  We again looked to Chaves and Sisters
and Brothers to hold that the revised parking plan was not a substantial
enough change to warrant a remand.  Id. ¶¶ 19-20.  We
concluded that the revised plan differed little from the original, except to
superimpose lines denoting specific parking spaces and to label the number of
available spots.  Id. ¶ 20.  While this conclusion helps
us little, we are guided somewhat by our statement that the court’s review is
limited to those matters that have undergone proper public notice and hearing
before the local board.  Id. ¶ 19.


¶ 103.    
These cases present the lower limit of the environmental court’s
discretion not to remand but provide little guidance on the upper limit. 
Because our prior case law is not particularly decisive in this area, we also
consider the role of the district commission and the policy behind the remand
requirement.  It is the role of the district commission to adjudicate Act
250 permit applications under the ten criteria.  10 V.S.A.
§§ 6083(a), 6086.  The Act 250 process also guarantees public notice
and the opportunity for interested parties to participate and present evidence
on the criteria.  Id. §§ 6084, 6085.  Furthermore, the
Act 250 Rules have codified the former Environmental Board’s consistent
practice of requiring new notice of project changes.  Rule 10(H) provides:


  If, in the course of reviewing an
application, the district commission determines that a project has changed from
the project that has been noticed to the extent that such change may have a significant
adverse impact under any of the criteria or may affect any person under any
criteria, the commission shall stay the proceedings and provide new notice of
the changed project, pursuant to this rule.


Act 250 Rule 10(H), 6 Code of Vt.
Rules 12 004 060-7, http://www.lexisnexis.com/

hottopics/codeofvtrules.  The Board further has held that remand to the
district commission is necessary when a project change may impact new criteria
or affect new parties.  See, e.g., In re Osgood, No. 7E0709-3-EB,
slip op. at 2 (Vt. Envtl. Bd. Nov. 26, 2002),
http://www.nrb.state.vt.us./lup/decisions.htm (stating that application must be
returned to commission if amendment involves construction on new lands, creates
impacts on new parties, or creates impacts to criteria not at issue before
Board); In re Colton, No. 3W0405-5(Revised)-EB, slip op. at 3 (Vt.
Envtl. Bd. Oct. 2, 2002), http://www.nrb.state.vt.us./lup/decisions.htm
(requiring remand to assess impacts from trucks using new driveway and changing
direction they turn from project tract onto state highway).


¶ 104.    
While the environmental court reviews appeals from the district
commission de novo, its authority is no larger than that of the district
commission and it cannot consider issues not presented to the commission, cf. Maple
Tree Place, 156 Vt. at 500, 594 A.2d at 407 (emphasizing that environmental
court “must resist the impulse to view itself as a super planning commission”
and therefore must not address issues “never presented to the planning
commission and on which interested persons have not spoken” (quotation
omitted)), particularly Act 250 criteria.  Cf. In re Taft Corners
Assocs., 160 Vt. 583, 591, 632 A.2d 649, 653 (1993) (stating that
Environmental Board’s jurisdiction is limited by proceedings below and does not
extend to new criteria never considered by district commission).  This
rationale is supported by our case law that acknowledges the particular
expertise of administrative bodies in adjudicating the issues before it. 
See, e.g., In re Stormwater NPDES Petition, 2006 VT 91, ¶ 30, 180
Vt. 261, 901 A.2d 824 (recognizing expertise of Agency of Natural Resources in
issuing stormwater permits); In re Investigation into Regulation of Voice
Over Internet Protocol Servs., 2013 VT 23, ¶ 32, 193 Vt. 439, 70 A.3d
997 (recognizing expertise of Public Service Board in assessing digital voice
services). 


¶ 105.    
With this background in mind, we turn to the revisions here.  The
original project as presented to the district commission involved construction of
a haul road off of Rounds Road and included an alternative South Street access
road to be constructed in the future, but that application was considered only
under Criterion 10.  The application as presented to the district
commission in 2010 for full consideration under the remaining criteria included
only the construction of a 300-lineal-foot haul road off of Rounds Road and
made no mention of the possibility of a future South Street access point.


¶ 106.    
As the environmental court found, the South Street access road
construction, including all work on the surrounding area and improvements to
South Street, will take one year to complete.  Construction will begin
with clearing and slope stabilization work, which will involve the
rehabilitation of the preexisting extraction area.  This extraction area
will then be graded and sculpted to create a level area for vehicles entering
and exiting the project site.  The exposed sand and gravel will be covered
with top soil, seeded, and mulched, and the natural ground cover will be
reestablished.  The access road will be paved from South Street to just
past the highest point of the access road.  As excavation progresses, the
access road will be realigned to accommodate excavation.  Lathrop submitted
an erosion prevention and sedimentation control plan for the access road
construction.  South Street itself will be widened to improve travel lanes
and add shoulders.  The court also found that while the work will occur
outside the buffers of the project area, resulting in more noise impacts to
neighbors, the work will be short and temporary in duration.


¶ 107.    
There is no indication that the access point was changed to address
substantial criticism of the Rounds Road proposal, and the revisions clearly
are more substantial than those discussed in Chaves and All Metals
Recycling.  Here, the South Street access point is not using a
preexisting road, and the parties potentially impacted by the improvements were
not necessarily involved in the case before the environmental court and thus
had no opportunity to comment.  Because construction is involved in a new
location—construction that involves earthmoving and reshaping the land,
equipment that may produce noise or dust, and possible future realignment—there
may be impacts on Act 250 criteria that were not reviewed by the district
commission.  The environmental court reviewed the project only with
respect to the limited criteria appealed from below: aesthetics, traffic,
impacts on public investments, impacts from pit operations, and consistency
with the town and regional plans.  The court never considered the new
criteria that may be impacted by this construction and the ensuing changes in
traffic patterns.


¶ 108.    
Lathrop urges that remand is unnecessary because neither the district
commission nor any interested parties have alleged that the Rounds Road access
point is preferable.  But Lathrop’s argument misses the point of the
district commission’s role.  First, without a full review of the access
road improvements, the district commission cannot make a full assessment as to
its impacts and therefore cannot opine on whether the South Street access point
is an improvement over the Rounds Road access point.  Second, the role of
the district commission is not just to select which alternative plans are the
most preferable.  The district commission also is responsible for
assessing the impacts of the project and conditioning them as necessary.


¶ 109.    
While we still promote the need for efficiency in the permitting process,
as discussed in Chaves, we decline to extend Chaves to project
revisions that may implicate new criteria not before the environmental court or
affect new parties not participating in the proceedings.  Truly minor
revisions of the type addressed in Chaves and All Metals Recycling,
specifically the type of revisions that mitigate impacts in response to the
concerns of interested parties, may still remain within the discretion of the
court and do not require remand.  But requiring remand for larger changes of
the type here preserves the role of the district commission and ensures
interested parties have the opportunity to comment and present evidence on the
new impacts.


¶ 110.    
We therefore conclude that the environmental court erred in failing to
remand the application to the district commission to assess the impacts from
the revised South Street access point.


Affirmed with respect to
sand and gravel extraction operations as a conditional use in the RA-2 and MIX
districts and the admissibility of the acoustical-modeling testimony. 
Reversed and remanded with respect to compliance with § 526(2) of the Town
of Bristol zoning bylaws for proceedings consistent with this decision. 
Reversed and remanded to determine whether the proposal approved by the
environmental court represented a substantial change from the proposal approved
by the ZBA in 2004 and to determine the preclusive effect of the 2004 ZBA
permit conditions.  Reversed and remanded to determine the impact of truck
traffic noise under Act 250 Criterion 8 consistent with this decision. 
The environmental court shall remand the Act 250 permit application to the
district commission for consideration of the project as presented to the
environmental court.


 


 




 
 

 
 
  

 

 
 
  

 

 
 
 FOR THE COURT:

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
  

 

 

 

 
 
  

 

 
 
  

 

 
 
 Associate
 Justice

 

 

 



 






 


Appendix


 






 
 

 
 
 Lathrop I: Proposed to ZBA in 2003 (as amended in
 2004)

 

 
 
 Lathrop I: Conditioned by ZBA in 2004

 

 
 
 Lathrop II: Proposed to ZBA in 2007 and to District
 Commission in 2010

 

 
 
 Lathrop III: Proposed to Environmental Division in
 2012 Appeal

 

 
 
 Conditioned by the Environmental Court in 2013

 

 

 

 
 
 60,000 cubic yds/yr

 

 
 
 Max 60,000 cubic yds/yr

 

 
 
 60,000 first 15 years;
 100,000/year thereafter

 

 
 
 Lathrop II

 

 
 
 Max 60,000 cubic yards/yr unless
 and until authorized by both the district commission and the ZBA

 

 

 

 
 
 17 daily truckloads

 

 
 
 17 daily truckloads on
 average; max 34 trucks per day

 

 
 
 36 daily truckloads on
 average; max 72 trucks per day

 

 
 
 Lathrop II

 

 
 
 Max 100 one-way truck trips
 per day unless and until authorized by the district commission and ZBA (50
 truckloads)

 

 

 

 
 
 South Street access road

 

 
 
 Access road paved to beyond
 crest; 25 feet wide min, not including ditches; runaway ramp at base

 

 
 
 Rounds Road access road

 

 
 
 South Street access road;
 22 feet wide minimum access road; no runaway ramp

 

 
 
  

 

 

 

 
 
 Mature trees within 200
 feet of roads and property lines will be maintained around perimeter of site

 

 
 
  

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
 Trees more than 200 feet from
 roads and property lines will be maintained until removal is necessary for
 extraction

 

 
 
  

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
 Mature maple trees will be
 maintained to buffer properties to the north

 

 
 
  

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
 Staggered line of softwoods
 will be planted on north side of property for further screening

 

 
 
 Rows of evergreens planted
 at the 570-foot elevation at the north end of the property; at least three
 rows; quick growing, dense, last for at least 50 years

 
  

 
  

 
  

 
  

 
  

 

 
 
 SAME but with more detail:
 4-5 feet high, staggered, 188 trees minimum, lists specific tree options

 

 
 
 Lathrop II

 

 
 
  

 

 

 

 
 
 Lathrop I: Proposed to ZBA in 2003 (as amended in
 2004)

 

 
 
 Lathrop I: Conditioned by ZBA in 2004

 

 
 
 Lathrop II: Proposed to ZBA in 2007 and to District Commission
 in 2010

 

 
 
 Lathrop III: Proposed to Environmental Division in
 2012 Appeal

 

 
 
 Conditioned by the Environmental Court in 2013

 

 

 

 
 
 1/2 vegetated slopes with
 flat interior pit floor and buffer of vegetation will remain when extraction
 is complete

 

 
 
 Must leave no slope steeper
 than 1/2; all slopes in excess shall be fenced

 

 
 
 SAME

 

 
 
 Remove part of South Street
 berm along north side of project as part of reclamation plan

 

 
 
 Revise to include plans to
 remove portion of berm

 

 

 

 
 
 Reclamation will be ongoing,
 creating 1/2 slopes reclaimed with vegetation moving top to bottom and south
 to north

 

 
 
 Excavated area shall be
 fertilized, mulched, and reseeded; no more than 2 acres unclaimed at any
 time; average rate of 1 acre per year; top down finish

 

 
 
 Maximum 5 acres disturbed
 at any time

 

 
 
 Lathrop II

 

 
 
  

 

 

 

 
 
 All surface drainage kept
 within confines of pit or excavated area

 

 
 
 All surface drainage shall
 be controlled

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
  

 

 
 
 No excavation, blasting, or
 stockpiling within 200 feet of road or other property line

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
  

 

 
 
 No power-activated sorting
 machinery located within 300 feet of road or property line and must be
 equipped with dust-elimination devices

 

 
 
 Not specified

 

 
 
 Not specified

 

 
 
  

 

 

 

 
 
  

 

 
 
 Hours of operation:

 
 ·      7:30-3:00
 M-F (all pit ops)

 
 ·      7:30-12:00
 S (loading only)

 
 ·      8:00-3:00
 M-F (blasting; 3 days/year)

 
 ·      Crushing
 limited to 20 days/year in May and September only

 

 
 
 Hours of operation:

 
 ·      7:00-4:30
 M-F; 7:00-3:30 S (site development)

 
 ·      6:30-4:30
 M-F; 7:00-3:30 (general ops)

 
 ·      7:00-3:30
 M-F; 7:30-12:00 S (sales)

 
 ·      Blasting:
 no change

 
 ·      Crushing:
 no limit on May and September

 
  

 
  

 
  

 

 
 
 Lathrop II

 

 
 
  

 

 

 

 
 
 Lathrop I: Proposed to ZBA in 2003 (as amended in
 2004)

 

 
 
 Lathrop I: Conditioned by ZBA in 2004

 

 
 
 Lathrop II: Proposed to ZBA in 2007 and to District
 Commission in 2010

 

 
 
 Lathrop III: Proposed to Environmental Division in
 2012 Appeal

 

 
 
 Conditioned by the Environmental Court in 2013

 

 

 

 
 
  

 

 
 
 All trucks covered

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
  

 

 
 
 All trucks over 2 cubic
 yard capacity must receive sticker

 

 
 
 Not specified

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
  

 

 
 
 Truck size, max 14 cubic
 yard dual axle and 19 cubic yard tri-axle; no trailers

 

 
 
 Not specified

 

 
 
 No limit on truck size or
 tractor trailers, except general legal limits

 

 
 
  

 

 

 

 
 
  

 

 
 
 Blasting mitigation:

 
 ·       Granular stemming

 
 ·       Boulders buried

 
 ·       Avoid detonating cord

 
 ·       Seismographs to measure air blast overpressure

 
 ·       Notification posted at entrance at least 7 days in advance

 

 
 
 SAME

 

 
 
 N/A—no blasting proposed

 

 
 
  

 

 

 

 
 
  

 

 
 
 Crushing mitigation:

 
 ·        Operated inside pit

 
 ·        Noisiest part directed away from residences

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
  

 

 
 
 Noise & dust mitigation:

 
 ·       No drilling earlier than one hour after sunrise

 
 ·       European-grade mufflers and other sound-control devices on all
 equipment

 
 ·       Backup alarm noise reduced

 
 ·       Trucks should not back up before loading

 
 ·       Screening deck inside pit; loudest side facing away from neighbors

 
 ·       Quarry site vegetated as much as possible

 
 ·       On-site water truck for dust control

 
 ·       Overburden used to create berms around perimeter of pit close to
 residential areas

 
 ·       No off-site emissions visible

 
 ·      Key
 lot and access road oriented to minimize noise

 
  

 

 
 
 SAME

 

 
 
 SAME, except no specific
 requirement for “European-grade” mufflers

 

 
 
 Noise mitigation shall be
 revised to include European-grade mufflers and prohibit engine compression or
 “jake” breaks

 

 

 

 
 
 Lathrop I: Proposed to ZBA in 2003 (as amended in
 2004)

 

 
 
 Lathrop I: Conditioned by ZBA in 2004

 

 
 
 Lathrop II: Proposed to ZBA in 2007 and to District
 Commission in 2010

 

 
 
 Lathrop III: Proposed to Environmental Division in 2012
 Appeal

 

 
 
 Conditioned by the Environmental Court in 2013

 

 

 

 
 
  

 

 
 
 Noise shall not exceed 55
 db at property line; if it does, additional mitigation necessary

 

 
 
 Noise from operational sources
 (excluding on-road trucks and blasts) limited to 55 db at all homes and areas
 of frequent human use

 

 
 
 Noise shall not exceed 55
 at residences and areas of frequent human use and 70 at property line; no
 noise limit on truck traffic or construction activities

 

 
 
  

 

 

 

 
 
  

 

 
 
 All materials and inventory
 stored in pit

 

 
 
 SAME

 

 
 
 Not specified

 

 
 
  

 

 

 

 
 
  

 

 
 
 All excavation, except
 access road, will stay in wooded area for 15 years

 

 
 
 SAME

 

 
 
 SAME

 

 
 
  

 

 

 

 
 
  

 

 
 
 No gravel imported from
 other sites

 

 
 
 Not specified

 

 
 
 Not specified

 

 
 
  

 

 

 

 
 
  

 

 
 
 Annual geologist’s report
 and truck log

 

 
 
 Not specified

 

 
 
 Annual report—not
 necessarily from geologist

 

 
 
  

 

 

 

 
 
  

 

 
 
 No processing in the MIX
 zone; gravel used to construct roads and berms within project site

 

 
 
 SAME

 

 
 
 See berm comment above

 

 
 
  

 

 

 






 


















[1] 
The initial application was submitted in July 2003 but was amended in January
2004.  For the purposes of this decision, we refer to this as the 2003
application, although the relevant details of the proposal are reflected in the
2004 amended application.







[2] 
Lathrop’s first appeal to the environmental court of its Act 250 permit
application, Docket No. 64-3-06 Vtec, was closed upon remand to the district
commission.  That docket is not part of this consolidated appeal.







[3] 
The statutory section referenced in the bylaw, 24 V.S.A. § 4407(8), was
repealed in 2005.  It provided that a municipality may adopt regulations
for sand, gravel, and soil removal requiring applicants to submit an acceptable
rehabilitation plan and post bond to assure rehabilitation.  Id.







[4] 
In many zoning cases, we find the language of the town plan helpful in
interpreting the disputed bylaw, but we do not find the Bristol Town Plan
helpful here.  We recognize that town plans merely are advisory, but,
because the bylaws must implement the plan, a plan can aid in interpreting an
ambiguous zoning provision.  Kalakowski v. John Russell Corp., 137
Vt. 219, 225-26, 401 A.2d 906, 910 (1979).  No section of Bristol’s plan
either expressly allows or prohibits sand and gravel removal or any other type
of extraction.  It encompasses many long-range goals to encourage business
development, economic growth, and compatible industrial and commercial
siting.  Bristol Town Plan 1-4 (2001).  The plan also incorporates
land use goals for each individual district, which establish the character of
the district, recommended uses that should predominate, and features that
should be promoted or protected.  Id. at 4-8.  Again, this
language is stated in broad, very general terms, and we cannot conclude from it
that a bylaw permitting sand and gravel extraction as a conditional use in any
zoning district fails to implement these goals.


 







[5] 
Section 4407(2) was repealed in 2005 and replaced with § 4414(3)(A), which
contains almost identical language.  Section 4407(2) stated:


 


  In any district, certain uses may
be permitted only by approval of the board of adjustment or the development
review board, if general and specific standards to which each permitted use
must conform are prescribed in the appropriate bylaws and if the board of
adjustment or development review board after public notice and public hearing
determines that the proposed use will conform to such standards.







[6] 
Neighbors also point to 24 V.S.A. § 4407(8) (repealed 2005), discussed supra,
¶ 13 n.3, but this adds nothing to their argument.  In fact, this
subsection of the statute may hurt their argument, infra, ¶ 26,
that we cannot interpret the bylaws in such a way that singles out sand and
gravel extraction for special treatment.  A clause at the end of
§ 4407(8) stated that it “does not apply to mining or quarrying.” 
Clearly the Legislature found reason to single out sand and gravel extraction
as distinct from mining and quarrying and entitled to special treatment.


 







[7] 
Neighbors also cite In re Bailey, 2005 VT 38A, 178 Vt. 614, 883 A.2d
765, to advance essentially the same argument.  Under Bailey, we
stated that we owe no deference to the environmental court’s interpretation of
an ordinance when the ordinance does not deviate from the enabling
statute.  Id. ¶ 9.  Because we conclude here that the
language of § 526 does deviate from the statute, Bailey does not
control.


 







[8] 
See, e.g., Town of Ferrisburgh Zoning Bylaws, § 5.8 (2010); Town of
Lincoln Zoning Regulations, § 570 (2011); Town of Morgan Zoning Bylaw,
§ 312 (2012); Town of Proctor Zoning Regulations, § 436 (2008); Town
of Stratton Zoning Ordinance & Permit Handbook, § 10045 (2007); Town
of Thetford Zoning Bylaw, § 5.02 (2011); Town of Westfield Zoning Bylaws,
§ 313 (2010); Town of Woodbury Zoning Ordinance, § 3.9 (1989).


 







[9] 
We think it is worth noting that an interpretation of § 526 that permits
sand and gravel extraction in all districts does not give the Town any broader
authority than conferred upon it by the enabling statute.  See City of
Montpelier v. Barnett, 2012 VT 32, ¶ 20, 191 Vt. 441, 49 A.3d 120
(“[A] municipality has only those powers and functions specifically authorized
by the legislature, and such additional functions as may be incident,
subordinate or necessary to the exercise thereof.” (quotation omitted)). 
The statute authorizes the Town to provide for conditional uses and ensure that
those uses meet the minimum standards set forth in the statute.  24 V.S.A.
§ 4414(3)(A).  The Town is within its discretion to choose the
districts within which conditional uses may be located.







[10] 
Although it is not entirely clear whether “one to two” slopes rise one foot for
every two feet across or vice versa, it does not bear on the question of
whether Lathrop’s project creates a pit.  Furthermore, as the
environmental court found, the slopes at Lathrop’s site never would exceed a
rise of one foot for every two feet across—the shallower interpretation of “one
to two.”







[11] 
The environmental court erroneously used the designation 10:1 in describing the
slopes, but the official mathematical designation is 1:10 (rise over run).







[12] 
Lathrop contends that neighbors failed to preserve this issue for appeal
because they never appealed the 2008 ZBA’s review of Lathrop’s revised
application but instead collaterally attack that decision in this consolidated
appeal.  Neighbors are correct in pointing out that what they are
contesting is not the 2008 ZBA’s review of the application but the
environmental court’s review of an application they claim is essentially the
same as that already conditionally approved by the 2004 ZBA.  Neighbors
raised the issue in a pre-trial motion, which the court denied.  They have
preserved the issue for appeal.







[13] 
The application to the district commission was virtually identical to the 2007
proposal to the ZBA.  The original proposal to the environmental court
also was identical to the 2007 proposal to the ZBA, but was modified to change
the access point in applicant’s evidentiary presentation.







[14] 
Lathrop’s engineering consultant testified that “in essence, [it is] the same
project” as that submitted to the ZBA in 2003.  This characterization
underlies many of the arguments of the parties.  In general, the
characterization is wrong and is the cause of confusion in this case. 
While it is similar to Lathrop’s initial proposal in 2003, it differs significantly
from the amended 2004 proposal, which was the proposal considered by the 2004
ZBA.







[15] 
We described the successive-application doctrine as an application of issue
preclusion in Woodstock Community Trust, 2012 VT 52, ¶ 4.  In
the earlier Dunkin Donuts decision, 2008 VT 139, ¶ 7, we
characterized the doctrine as an application of claim preclusion.  The
description in Dunkin Donuts was correct, and we employ it in this
opinion.  To the extent it may be relevant in the future, we correct the
mistake in Woodstock Community Trust.


 







[16] 
The court did not actually rule on the applicability of permit amendment
requirements, although they were discussed in filings from the neighbors. 
Our discussion reflects the necessarily implied ruling of the court.


 







[17] 
It is not clear what action of Lathrop the court is referring to.  In the
appeal of Lathrop II, Lathrop filed a list of questions and an
amended list of questions.  In neither is there a question with respect to
the 2004 conditions.  In the appeal of Lathrop I, neighbors
submitted questions, pursuant to Vermont Rule for Environmental Court
Proceedings 5(f), one of which asked whether the application “adequately
addressed all proper concerns for the health and safety of the
residents.”  This question might be taken to have raised impliedly the
adequacy of the ZBA conditions, but it did not help Lathrop, who was prohibited
from submitting questions without a cross-appeal.  See In re Garen,
174 Vt. at 156, 807 A.2d at 851.







[18] 
Of course, the applicant can indicate that any changes are not substantial and,
if the board or court agrees, proceed to the third step.


 







[19] 
These standards are applicable if the zoning bylaws do not set forth different
ones.


 







[20] 
The final judgment of the environmental court sets the extraction rate at
60,000 cubic yards, as conditioned in the 2004 permit, but allows Lathrop to
seek a permit amendment after fifteen years to allow a higher extraction
rate.  Since Lathrop could always seek a permit amendment, we do not see
that provision in the court’s judgment as significant.


 







[21] 
Although Lathrop’s proposal is confusing, we read it to propose a higher limit,
an average daily one-way trip rate of 72 trucks per day and a peak one-way trip
rate of 144 trucks per day.







[22] 
The dBA scale sets 0 dBA at the threshold for human hearing. 







[23] 
We note that the environmental court’s conclusion was based in part on the frequency
of loaded trucks leaving Lathrop’s property and the project’s operational
season as it relates to the operational season of Lathrop Forest Products, the
wood pellet plant located across South Street.  Assuming the number of
truck trips per day was even further limited by the condition imposed by the
2004 ZBA order, there would be less noise.







[24] 
Because we conclude that the court did not err in admitting the evidence under Daubert
and Rule 702, we do not reach neighbors’ argument that the court erred in
admitting the evidence under Vermont Rule for Environmental Court Proceedings
2(e)(1), which allows evidence not privileged and otherwise inadmissible under
the Rules of Evidence to be admitted at the discretion of the court “if it is
of a type commonly relied upon by reasonably prudent persons in the conduct of
their affairs.”